

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

NORTHERN DISTRICT OF TEXAS
FILED

MAR 25 2003

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| TIMOTHY KEELEY | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3-01CV1504-D |
| | § | |
| CISCO SYSTEMS and SUN MICROSYSTEMS | § | |
| Defendants | § | |

**DEFENDANT SUN MICROSYSTEMS, INC.'S BRIEF IN SUPPORT OF
RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Liane A. Janovsky
State Bar No. 00784330
Lon R. Williams, Jr.
State Bar No. 21603200
Elizabeth Fruin Smith
State Bar No. 24032207

**BRACEWELL & PATTERSON, L.L.P.**
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-3387
Telephone (214) 758-1000
Facsimile (214) 758-1010

**ATTORNEYS FOR DEFENDANT
SUN MICROSYSTEMS, INC.**

March 25, 2003

**TABLE OF CONTENTS**

**Page**

I.     SUMMARY ................................................................................................. 1

II.    STANDARD FOR SUMMARY JUDGMENT ............................................... 2

III.   STATEMENT OF RELEVANT UNDISPUTED FACTS .............................. 2

       A.     Keeley's History at Sun Microsystems ............................................ 3

            1.     Keeley's Complaints about Commission Compensation ........................... 3

            2.     Blair Learns of Problems with Keeley's Job Performance ....................... 4

            3.     Keeley's Commission Compensation Dispute is Resolved Pursuant to Sun's Commission Policies .................................................................... 6

            4.     Keeley Accuses Blair of "Retaliating" Against Him for Escalating the Commission Compensation Dispute .................................................. 6

            5.     Keeley's Job Performance Further Deteriorates......................................... 8

            6.     Keeley Makes His First Complaint of Discrimination to HR.................... 8

       B.     Keeley Resigns from Sun.................................................................. 10

            1.     Keeley Seeks Undocumented Expense Reimbursements from Sun ........ 10

            2.     Keeley Files a Charge With the EEOC.................................................... 11

            3.     Blair is Not Told About the EEOC Charge ............................................ 11

       C.     Cisco Interviews Major Account Managers ....................................... 12

            1.     Keeley's Initial Interviews Go Well........................................................ 12

            2.     Cisco Makes Keeley a Job Offer Conditioned on a Successful Background Check.................................................................................. 13

            3.     Ash Asks Blair for a Job Reference, but Blair Declines.......................... 14

            4.     Ash Learns of Keeley's Poor Interview With Ward ................................ 15

            5.     Cisco Declines to Hire Keeley................................................................. 16

       D.     Blair Learns of Keeley's Protected Activity....................................... 16

**TABLE OF CONTENTS**
(continued)

**Page**

IV.  ARGUMENTS AND AUTHORITIES ................................................................................ 17

    A.  Keeley's Motion for Partial Summary Judgment on the Declaratory
        Judgment Fails as a Matter of Law ........................................................................ 17

        1.  The Release is not in Violation of Public Policy ...................................... 17

        2.  The Release Need Not be More Specific .................................................. 18

        3.  The Release Did Not Limit Cisco's Sources of Background
            Information ................................................................................................ 19

    B.  Keeley's Tortious Interference Claim Fails As a Matter Of Law ......................... 19

        1.  Keeley Cannot Demonstrate a *Prima Facie* Claim of Tortious
            Interference with Prospective Contracts ................................................... 20

        2.  Blair's Remark to Ash Did Not Prevent Keeley from being hired by
            Cisco or Otherwise Cause Him Damage .................................................. 23

V.  CONCLUSION ..................................................................................................................... 23

VI.  REQUEST FOR RELIEF .................................................................................................... 24

**Cases**

*American Heritage v. Orr*,
   294 F.3d 702 (5th Cir. 2002) ................................................................................ 2

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................. 2

*Baty v. Protech Ins. Agency*,
   63 S.W.3d 841 (Tex. App. – Houston [14th Dist.] 2002, no pet.) ........................ 22

*Bodenheimer v. PPG Indus.*,
   5 F.3d 955 (5th Cir. 1993) ................................................................................... 2

*Browning-Ferris, Inc. v. Reyna*,
   865 S.W.2d 925 (Tex. 1993) ............................................................................... 20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................. 2

*Curlin v. Maples*,
   2003 U.S. Dist. Lexis 3431*, *8 (N.D. Tex. March 7, 2003) (Sanders, J.) ........... 18

*Exxon Corp. v. Allsup*,
   808 S.W.2d 648 (Tex. App. – Corpus Christi 1991) ........................................... 20

*In re Halliburton*,
   80 S.W.3d 566 (Tex. 2002) ................................................................................. 17

*Keck, Mahin & Cate v. National Union Fire Ins. Co.*,
   20 S.W.3d 692 (Tex. 2000) ................................................................................. 18

*Lawrence v. CDB Servs.*,
   44 S.W.3d 544 (Tex. 2001) ................................................................................. 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................................. 2

*Sterner v. Marathon Oil Co.*,
   767 S.W.2d 688 (Tex. 1989) ............................................................................... 20

*Wal-Mart Stores, Inc. v. Sturges*,
   52 S.W.3d 711 (Tex. 2001) ................................................................................. 20

*Willis v. Sweetheart Cup*,
   2002 U.S. Dist. LEXIS 498 * 12  (N.D. Tex. 2002) (Boyle, M.) .......................... 20

**Other Authorities**

FED. R. CIV. P. 56(c)..................................................................................................... 2

FED. R. CIV. P. 56(e)..................................................................................................... 2

Federal Rule of Civil Procedure 56 ............................................................................... 1

Tex. Lab. Code Ann. Sections 103.003 and 103.004 (Vernon 2002)............................... 18, 21, 22

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TIMOTHY KEELEY | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  3-01CV1504-D |
| | § | |
| CISCO SYSTEMS and SUN | § | |
| MICROSYSTEMS | § | |
| | § | |
| **Defendants** | § | |

### DEFENDANT SUN MICROSYSTEMS, INC.'S BRIEF IN SUPPORT OF RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and all applicable Local Rules of the Northern District of Texas, Defendant Sun Microsystems, Inc. ("Sun Microsystems" or "Sun") files this Brief in Support of the Response to Plaintiff's Motion for Partial Summary Judgment.

### I. SUMMARY

Plaintiff filed a motion for partial summary judgment seeking a declaratory judgment that the release of claims in his job application to Cisco is unenforceable.  Plaintiff also seeks partial summary judgment granting his claim of tortious interference with prospective economic advantage against Sun.  Keeley's motion for partial summary judgment on the declaratory judgment fails as a matter of law.  The release of claims is not contrary to public policy, is valid under Texas law, and entitles Defendants Sun and Cisco to dismissal of Plaintiff's common law claims.

Plaintiff's argument on the tortious interference claim fails because Plaintiff has applied invalid case law.  The correct legal standards and the undisputed summary judgment evidence, as presented in Sun's Amended Motion for Summary Judgment and supporting Appendix, demonstrate that Plaintiff cannot demonstrate a *prima facie* claim of tortious interference with

prospective contract. Thus Plaintiff's motion for partial summary judgment on his tortious interference claim must be denied.

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) requires that the court enter summary judgment after adequate time for discovery and upon motion against the party who fails "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the party with the burden of proof on the merits, Keeley must introduce sufficient evidence to establish the existence of all elements essential to his case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Keeley "must do more than simply show that there is some metaphysical doubt as to the material facts," and thus, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986), quoting FED. R. CIV. P. 56(e) (emphasis original).

## III. STATEMENT OF RELEVANT UNDISPUTED FACTS

Plaintiff's purported "Background Facts" contain assertions unsupported by competent summary judgment evidence. Plaintiff Keeley's Affidavit in particular contains self-serving, unsubstantiated assertions which are not competent evidence under FED. R. CIV. P. 56(e). *American Heritage v. Orr*, 294 F.3d 702, 710 (5th Cir. 2002). Self-serving, conclusory affidavits are to be ignored. *Bodenheimer v. PPG Indus.*, 5 F.3d 955, 959 (5th Cir. 1993). In contrast to the background "facts" presented in Plaintiff's motion for partial summary judgment, the following

**DEFENDANT SUN MICROSYSTEMS, INC.'S BRIEF IN SUPPORT OF**
**RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**          Page 2 of 25

are relevant undisputed facts supported by extrinsic evidence contained in the Appendix to Sun's Motion for Summary Judgment:

**A.   <u>Keeley's History at Sun Microsystems.</u>**

Timothy Keeley was hired by Sun Microsystems on October 7, 1998 as a Sales Representative C (Sun's Appendix to Amended Motion for Summary Judgment ("Appendix") pp. 1-5). In early July of 1999, Kevin Blair became the Sun Microsystems' Dallas District Manager for Service Provider Sales, replacing Keeley's former manager Gerry Collins (Appendix 173).

**1.   Keeley's Complaints about Commission Compensation.**

Shortly after Kevin Blair became Keeley's supervisor, Keeley came to Blair with a complaint about his FY99 commission compensation, and asked Blair to assist him in obtaining some unpaid commissions (Appendix 173). Blair immediately agreed to help Keeley, because Blair considered proper commission compensation to be essential to maintaining employee morale and retaining good employees (Appendix 173).

In response to Keeley's dissatisfaction with his compensation, Central Area Controller Tony Benson, Keeley's supervisor Kevin Blair, Central Area Vice President Bill Cook, Central Area Regional Director Don Deason, and Senior Human Resources Specialist Linda Linder worked together to analyze and determine if Keeley had received proper compensation for sales commissions in FY99 (Appendix 227).

Since Kevin Blair was not Keeley's supervisor in FY99, Blair had to undertake a great amount of research to determine the sales for which Keeley was entitled to commissions (Appendix 173-174, 227). Complicating this research was the fact that Keeley did not provide needed documentation to help demonstrate that he had worked with Sun's clients to close the sales for which Keeley sought commission credit (Appendix 173-174, 227).

**DEFENDANT SUN MICROSYSTEMS, INC.'S BRIEF IN SUPPORT OF**
**RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**       Page 3 of 25
Ft.Worth/90168.1

**2.     Blair Learns of Problems with Keeley's Job Performance.**

In order to investigate Keeley's commission compensation problem, Kevin Blair needed to look at any available documents showing that Keeley had facilitated the client sales for which he sought commission compensation (Appendix 174).   Unfortunately, despite frequent requests on Blair's part, Keeley did not provide Blair with the documents needed to make the case that Keeley was entitled to additional commission compensation (Appendix 174).

Since Kevin Blair could not get the documents he needed from Keeley in the late Summer of 1999, he contacted the Sun Microsystems' Travel Department to request documents showing the business trips Keeley had taken in FY99 (Appendix 174).   In response to Blair's request, he was shocked to receive complaints about Keeley from personnel in the Travel Department (Appendix 174).   Blair was told that the Travel Department was having great difficulty with Keeley booking trips that he did not take, and incurring unnecessary expenses for last minute cancellations and rebookings (Appendix 174).   While the Sun Travel Department was able to provide Blair with confirmation of some of Keeley's business trips, it also caused Blair to think Keeley was not as effective and reliable as Blair had assumed from his first impression of Keeley (Appendix 174).

After Kevin Blair received the Travel Department complaints about Keeley, he learned that Keeley had spent a weekend in Chicago, flying at Sun's expense and staying in a company-paid hotel room, purportedly for the purpose of seeing one of Sun's clients the following Monday (Appendix 174).   When Keeley returned to Dallas from Chicago, he told Blair that he had a great sales meeting with the client (Appendix 174).   Shortly after Keeley told Blair this, Blair found out that Keeley in fact never went to meet with the client representatives (Appendix 174).   When Blair pressed Keeley for details about what happened with the client meeting, Keeley explained that he had lost his identification during the weekend while he was in Chicago, and the airline

DEFENDANT SUN MICROSYSTEMS, INC.'S BRIEF IN SUPPORT OF
RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT          Page 4 of 25
Ft.Worth/90168.1

would not let him board the plane for the last leg of the trip without the I.D. (Appendix 174). Keeley said that instead of meeting the client representatives in person, he had a telephone conference call with them from Chicago, and then flew back to Dallas (Appendix 174). Keeley told Blair that while the airline would not let him fly without his I.D., they would let him fly home to Dallas (Appendix 174). This situation bothered Kevin Blair, because he felt that Keeley had tried to deceive him about the client visit and the purpose of the trip to Chicago (Appendix 174). Coming on the heels of the criticisms made to Blair by the Sun Travel Department, Blair began to feel skeptical about Keeley's trustworthiness (Appendix 174).

Around the same time as this incident, Kevin Blair and his sales team attended the Sun Microsystems' National Sales Meeting in Chicago between September 8 and 10, 1999 (Appendix 174). Keeley was there, as was Blair's supervisor Don Deason (Appendix 174). During one of the sales meetings, Deason noticed and commented to Blair that he did not see Keeley in the meeting (Appendix 174). After the meeting, Don Deason and Kevin Blair saw Keeley in the lobby outside the meeting room (Appendix 174). Blair asked Keeley what he thought of the presentation, and Keeley enthusiastically stated that it was great and he really enjoyed it (Appendix 174). Blair then mentioned to Keeley that Deason and Blair looked for Keeley in the meeting but didn't see him there (Appendix 174). At that point, Keeley admitted that he had not attended the presentation, but had been working in Sun's Chicago office during the meeting (Appendix 175). White Blair did not mind that Keeley had missed the presentation to work, Blair was very bothered by Keeley's casual lie about attending the presentation when he wasn't there at all (Appendix 175). This incident further shook Kevin Blair's trust and confidence in Keeley (Appendix 175).

Despite the negative Sun Travel Department comments about Keeley, Keeley's misrepresentations to Blair about his client visit and Keeley's misrepresentations to Blair and Deason about his attendance at the National Sales Conference, Kevin Blair still felt committed to helping Tim Keeley resolve his commission compensation claim (Appendix 175).

### 3. Keeley's Commission Compensation Dispute is Resolved Pursuant to Sun's Commission Policies.

Based upon Blair's research and analysis, Benson, Blair, Cook, Deason, and Linder determined that Keeley should receive compensation payouts and adjustments (Appendix 175, 186, 228, 236). Once the sales commission dispute was resolved in Keeley's favor, Kevin Blair wanted Keeley to put this issue behind him and focus on new sales, as Keeley was already far behind on his sales goals for Fiscal Year 2000 ("FY00") (Appendix 176). Keeley did not think that the additional commission compensation was enough, and did not think the resolution was favorable (Appendix 176). It also seemed to Blair that Keeley was not focusing his attention and efforts on trying to make money by making new sales (Appendix 176). Instead, Blair thought that Keeley was focusing all of his effort on maximizing his profits under the Sun Microsystems' compensation "system", and seemed more interested in playing the system than generating and closing new sales (Appendix 176).

### 4. Keeley Accuses Blair of "Retaliating" Against Him for Escalating the Commission Compensation Dispute.

On or about November 24, 1999, Linda Linder received an email from Keeley, in which he stated "The thing that I feared most has manifested itself. I exercised Sun's escalation process in an attempt to resolve an outstanding compensation issue in FY99. I have experienced some tangible and intangible hostility, due to this escalation" (Appendix 229, 253-254). Keeley described the problem as "managerial retaliation due to a perceived lack of respect for Suns (sic) escalation process" (Appendix 253).

**DEFENDANT SUN MICROSYSTEMS, INC.'S BRIEF IN SUPPORT OF RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
Ft.Worth/90168.1

Page 6 of 25

Sun Human Resources Generalist Elke Rogers contacted Keeley and met with him on December 3, 1999 to discuss Keeley's grievances against Kevin Blair, and his grievances regarding the settlement of his FY99 commission credit and compensation issue (Appendix 256). Keeley described to Rogers his history with Sun Microsystems and the history of his FY99 commission compensation dispute (Appendix 256, 263-264). Keeley stated to Rogers that he feared his relationship with Kevin Blair had been damaged by Keeley going over Blair's head to complain about his commission compensation to Senior Vice President John Marcelle (Appendix 256, 263-264). Keeley also said to Rogers that he felt he was being scrutinized by Blair in retaliation for the commission dispute, and requested a transfer to another Sun Microsystems' District (Appendix 256, 263-264). Keeley also acknowledged to Rogers that he should have worked with Blair to meet with customers on his FY00 Goal Sheet (Appendix 256, 263-264). However, Keeley did not complain to Elke Rogers about race discrimination or retaliation for pursuing protected activity under anti-discrimination laws (Appendix 256, 263-264).

After Elke Rogers' meeting with Keeley, she reported back to Linda Linder about her investigation of Keeley's complaints (Appendix 229, 256). After talking to Rogers, Linder determined that Keeley's retaliation complaint against Blair did not involve a claim of retaliation in violation of anti-discrimination law (Appendix 229, 236). Linder ultimately determined that Blair's conduct towards Keeley was not improper (Appendix 229). Linder stated to Rogers that Keeley's commission issue was "done & closed", and would not be reopened (Appendix 256). Rogers relayed this information back to Keeley, and also explained to him that Sun could not consider his request for transfer at that time due to Keeley's sales performance compared to his FY99 and FY00 Goal Sheet target budgets (Appendix 256).

5.      **Keeley's Job Performance Further Deteriorates.**

In approximately December of 1999, Kevin Blair began to consider placing Keeley on a Performance Improvement Plan ("PIP") because of Keeley's ongoing poor sales performance for the first part of FY00 (Appendix 177).   Also, Blair's investigation of Keeley's commission compensation claim caused Blair to wonder about how much time Keeley was spending chasing old commission revenue credit instead of pursuing new accounts and new sales (Appendix 177). Keeley's inability to give Blair any dates, times, or client meeting locations to support Keeley's commission credit claim had caused Blair to question how engaged Keeley was in day-to-day sales work (Appendix 177).   Keeley's lack of documentation to support his commission claims, coupled with being caught in untruthful statements about his activities on two trips to Chicago, also caused Blair to lose his trust in Keeley (Appendix 177).   By late-January of 2000, Blair was ready to put Keeley on a PIP (Appendix 177).   But, Keeley quit his employment with Sun Microsystems before Blair could prepare any PIP documents (Appendix 177).

6.      **Keeley Makes His First Complaint of Discrimination to HR.**

Human Resources Manager Vicky Yee of Sun's HR Diversity Group in California was first contacted by Keeley by telephone and by email on or about January 5, 2000 (Appendix 294, 297-298), the day after he began his concurrent employment with Sun customer Exodus (Appendix 161, 163, 167).   In his first email to Yee, Keeley provided Yee with a copy of the November 24, 1999 email he sent to Linda Linder regarding his commission dispute and his belief that Kevin Blair was retaliating against him for escalating his dispute to Senior Vice President John Marcelle (Appendix 294, 297-298).   The "retaliation" alleged by Keeley in the email to Yee did not involve claims of race discrimination or retaliation for participating in activity protected by anti-discrimination law (Appendix 294, 297-298).   Instead, it merely

involved Keeley's perception of a dispute with his manager regarding Keeley's decision to escalate his commission compensation dispute to a corporate officer (Appendix 294, 297-298).

Yee looked into Keeley's past commission compensation dispute and learned that his dispute was investigated and resolved by Sun management, and that supplemental commission was paid to him based upon Blair's analysis of Keeley's sales and pursuant to Sun's commission policies (Appendix 294-295).

On January 10, 2000, Vicky Yee received a fourth email from Keeley, to which Keeley attached prior emails going back to February of 1999 regarding his "outstanding FY99 compensation issue" (Appendix 295, 301-320). None of these emails asserted claims of race discrimination or retaliation for participation in activity protected by anti-discrimination law (Appendix 295, 301-320).

On or about January 12, 2000, Keeley and Yee spoke on the telephone (Appendix 295). During this call, Keeley alleged that he believed that he and other African American sales representatives in the Central Region were experiencing negative treatment and a hostile work environment, and he believed this was a systemic problem within the Central Region (Appendix 295). Yee followed up with this call by contacting Elke Rogers, and asking her to describe the circumstances involving Keeley's grievances to date, all of which involved commission compensation, and none of which involved allegations of race discrimination or discriminatory retaliation (Appendix 295).

Vicky Yee then sent Keeley an email dated January 12, 2000, writing a summary of what Yee understood to be Keeley's discrimination allegations and commission compensation grievances, describing the information relayed to Yee by Elke Rogers, and attaching a copy of an email from Kevin Blair to Keeley describing management's October 8, 1999 resolution of the

commission compensation dispute (Appendix 295, 321-323). Vicky Yee stated in her email "I'd like you to review my summary of your allegations before I proceed any further with an investigation because of the concerns you expressed about my role and the process I am executing" (Appendix 295, 322-323).

Vicky Yee never received a response from Keeley to her January 12, 2000 email (Appendix 295). Yee later learned that Keeley resigned his employment with Sun Microsystems on January 20, 2000 (Appendix 295). Because Keeley did not respond to Vicky Yee's January 12, 2000 email requesting confirmation of the nature and scope of his race discrimination allegations, Yee closed out her investigation file (Appendix 295). Neither Yee, Linda Linder nor Elke Rogers conducted an investigation of Keeley's allegations (Appendix 256, 296).

## B. <u>Keeley Resigns from Sun.</u>

On December 20, 1999, Keeley applied for employment with Exodus (Appendix 154-155, 164-166), a client of Sun Microsystems (Appendix 178, 395). On December 23, 1999, Exodus made Keeley an offer of employment (Appendix 162-163). Keeley accepted Exodus's employment offer (Appendix 161, 163). Keeley began his employment with Exodus on January 4, 2000 (Appendix 161, 163). Keeley received his first pay check from Exodus for the pay period through January 14, 2000 (Appendix 167). But Keeley did not resign his employment with Sun Microsystems until January 20, 2000, the day he filed his charge of discrimination with the EEOC (Appendix 177, 256, 295).

### 1. **Keeley Seeks Undocumented Expense Reimbursements from Sun.**

Over the next several months, Elke Rogers exchanged emails with Kevin Blair about the need to recover Sun's property from Keeley, and about requests for out-of-pocket expense reimbursements that Keeley submitted after his resignation (Appendix 34-56, 177, 256-257, 266-293). Rogers told Blair that she was having great difficulty getting Keeley to provide receipts

and documents showing that these were actually business expenses (Appendix 34-56, 256-257, 266-293). Keeley did not submit his final expense reimbursement report to Rogers until August 18, 2000 (Appendix 256, 292).

### 2. Keeley Files a Charge With the EEOC.

On or about January 25, 2000, Elke Rogers received a charge of race discrimination and retaliation from the EEOC for Tim Keeley (Appendix 257). Rogers immediately forwarded the charge to Linda Linder and to the Sun Microsystems' Legal Department for further handling (Appendix 257). Rogers did not assist Linder or the Sun Legal Department with their preparation of Sun's responses to Keeley's January 20, 2000 EEOC Charge of Discrimination and Retaliation, or his July 5, 2000 EEOC Charge of Discrimination and Retaliation (Appendix 257).

### 3. Blair is Not Told About the EEOC Charge.

Linda Linder assisted Sun's Legal Department in California with its preparation of a response to Keeley's January 20, 2000 EEOC charge of discrimination and retaliation (Appendix 229). Linder did not tell Kevin Blair about Keeley's January 20, 2000 EEOC charge of discrimination and retaliation when Sun was preparing its response to the charge in February and March of 2000 (Appendix 229). Linder did not discuss the charge with Blair because it is Sun's policy not to disclose confidential information, including information about the filing of charges of discrimination against the company, to anyone except on a "need-to-know" basis (Appendix 229). It was not necessary for Linder to involve Blair in the preparation of the response to the EEOC charge because corporate counsel and Linder had sufficient information and documentation to respond to the charge without Blair's involvement or knowledge, and Blair did not have a "need-to-know" about the charge (Appendix 229).

Elke Rogers never informed Blair at any time that Keeley had filed a charge of discrimination and retaliation with the EEOC after Keeley's resignation from Sun (Appendix

**DEFENDANT SUN MICROSYSTEMS, INC.'S BRIEF IN SUPPORT OF**
**RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**          Page 11 of 25
Ft.Worth/90168 1

257). In the months after Keeley's resignation, Kevin Blair and Elke Rogers only discussed Keeley's out-of-pocket expense reimbursement requests and the return of Sun property in Keeley's possession (Appendix 257). Rogers did not discuss the January 2000 or July 2000 Charges of discrimination with Blair until after the instant lawsuit was filed was because Rogers was not involved in the preparation of Sun's responses to the charges of discrimination (Appendix 257). Since Rogers was not involved in the preparation of Sun's responses to the charges of discrimination, she had no reason to discuss the charges with Blair (Appendix 257).

Vicky Yee did not participate in the investigation or work conducted by Sun Microsystems in response to Keeley's January 20, 2000 EEOC Charge of Discrimination and Retaliation, or his July 5, 2000 EEOC Charge of Discrimination and Retaliation (Appendix 296). Yee has never spoken with Kevin Blair about any of Keeley's allegations of race discrimination and retaliation (Appendix 296).

## C. Cisco Interviews Major Account Managers.

In the Spring of 2000, Cisco Systems began interviewing for a Major Account Manager to work on its American Airlines, Sabre, Travelocity and Get There sales accounts, as part of a team with Major Account Manager Karen Ward (Appendix 343, 345, 355, 356). The position became vacant because of communication problems and lack of teamwork on the part of the previous Major Account Manager (Appendix 343). Specifically, the previous Major Account Manager communicated poorly with Karen Ward in a position where regular communication regarding planning and strategy was essential (Appendix 343).

### 1. Keeley's Initial Interviews Go Well.

Keeley applied for the Cisco Major Account Manager position in May of 2000 (Appendix 168-170, 366). On the job application, Keeley misrepresented to Cisco that his Sun Microsystems manager was Gerry Collins, instead of identifying Kevin Blair (Appendix 169).

Keeley made this misrepresentation of fact on the Cisco job application despite the warning that "providing false information may result in a decision not to hire me." (Appendix 169). Dean Ash, the Cisco Regional Sales Manager responsible for filling the job vacancy, received at least 17 job applications from applicants external to Cisco, including Keeley's (Appendix 340, 348-349).

Keeley was initially interviewed for the position by several people including Ash, Wells Morse, David Cappello, Brian Morgan, Mark Wilhelm and Bob Johnston, and the interviews yielded generally favorable feedback (Appendix 348, 349). Ash then arranged for Keeley's potential job partner, Karen Ward, to interview him (Appendix 348). Karen Ward interviewed Keeley in the lobby of the Omni Hotel in Las Colinas, Texas, for approximately one hour (Appendix 348, 367). During the interview, Ward was troubled by Keeley's lack of eye contact with her, and his apparent disinterest in what she had to say (Appendix 372, 374, 375). In light of Ward's prior problem with poor communication from the previous Major Account Manager, she was uncomfortable and a bit concerned with Keeley's lack of eye contact (Appendix 372, 374, 375). But, after the Ward-Keeley interview, Ward had a twenty-second cell phone call with Dean Ash and gave Ash generally favorable feedback about Keeley's sales skills (Appendix 375). However, when Ward returned to her main office in Tulsa, Oklahoma, she informed her immediate supervisor, Greg Stump, about her concerns regarding Keeley's lack of eye contact and communication skills (Appendix 371, 372, 375, 376).

### 2. Cisco Makes Keeley a Job Offer Conditioned on a Successful Background Check.

On May 30, 2000, Ash sent Keeley a conditional offer letter (Appendix 171-172), conditionally offering Keeley the Major Account Manager position contingent upon Cisco's completion of successful reference checks and a background investigation (Appendix 171-172).

As part of the background check Ash conducted on Keeley, Ash contacted Kevin Blair to see if he could obtain a job reference for Keeley from Blair (Appendix 349, 350, 351). Dean Ash first became acquainted with Kevin Blair in approximately 1995, when Ash worked for a company called Amdahl (Appendix 341). Amdahl and Sun Microsystems formed a partnership in approximately 1995 to service client Fidelity Investments (Appendix 337). Ash, in his capacity as an Amdahl representative, and Blair, in his capacity as a Sun Microsystems representative, worked on projects together for Fidelity (Appendix 337, 341) for approximately two years (Appendix 341). Ash and Blair became friendly business acquaintances with a mutual respect for one another, but their relationship was always professional and did not expand to a close, personal friendship (Appendix 341, 337). Ash also had infrequent interactions with Blair after Ash left Amdahl for Cisco (Appendix 342).

### 3.    Ash Asks Blair for a Job Reference, but Blair Declines.

In late May of 2000, Kevin Blair received a telephone voice mail message from Dean Ash asking Blair if he knew Tim Keeley, and if so, if Blair could provide Ash with a job reference for Keeley (Appendix 177, 349). Blair was on a business trip when Ash left the voice mail message (Appendix 177). Blair responded to Ash's voice mail message with his own voice mail to Ash's office telephone number within a day or two of getting Ash's message. (Appendix 177). In Blair's voice mail to Ash, Blair stated that he did know Keeley, and that Keeley actually reported to Blair for a period of time at Sun, but Sun's policy was not to give specific references, and that while he was sorry that he could not give a reference, but there are a lot of fish in the sea Appendix 177). Ash did not call Blair back about this voice mail message after Blair sent it (Appendix 177).

In the voicemail from Blair to Ash, Blair never told Ash anything about Keeley's exit from Sun Microsystems, or about Keeley's EEOC charge of discrimination or HR Departments

complaints (Appendix 177, 337, 349, 350-351). Neither Dean Ash nor Karen Ward knew about Keeley's EEOC charge or complaints to Sun's HR Department at the time they were evaluating Keeley's candidacy for Cisco employment (Appendix 351, 382).

By "there are a lot of fish in the sea", Kevin Blair meant that there were a lot of people out in the market who are qualified to work in high technology sales (Appendix 177). At the time Blair made the "fish in the sea" statement to Ash's voice mail, Blair did not know that Keeley had made any complaints of race discrimination or retaliation to Sun or to the EEOC (Appendix 177). Also, Blair's statement was entirely honest and truthful, and was not made with any malice or ill will (Appendix 177). Blair knew from personal experience that there were many people in the job market qualified to work in high technology sales (Appendix 177). Blair knew from his previous supervision of Keeley that there were better qualified sales representatives at Sun Microsystems, and on the job market, when compared to Keeley, because of Keeley's poor sales performance, poor record keeping, poor rapport with Sun's Travel Department, and misrepresentations of facts by Keeley to Blair and to Don Deason (Appendix 177, 178). Keeley's FY00 sales report demonstrates that Keeley only achieved 27% of his sales goals for Sun for FY00, in addition to only achieving 65% of his FY99 sales goals (Appendix 178, 207, 329, 335, 336). This combination of true, factual information motivated Kevin Blair's "fish in the sea" comment to Dean Ash (Appendix 178).

Dean Ash understood Kevin Blair's "fish in the sea" comment to mean that there were a lot of candidates in the marketplace to be looked at (Appendix 350).

### 4. Ash Learns of Keeley's Poor Interview With Ward.

At approximately the same time that Dean Ash received Kevin Blair's voice mail message, Ash received a call from Greg Stump, Karen Ward's direct supervisor. Stump told Ash that Ward was concerned about Keeley's lack of eye contact and Keeley's apparent disinterest in

what Ward had to say to him in the job interview (Appendix 350, 375). Ash then spoke to Ward, and she described her concerns about Keeley's eye contact and communication skills, particularly in light of the fact that poor communication by the prior Major Account Manager created the job vacancy Ash was trying to fill (Appendix 350).

> **5.    Cisco Declines to Hire Keeley.**

Based upon this investigation into Timothy Keeley's background, Dean Ash determined that Keeley was not a suitable candidate for the Major Account Manager position (Appendix 349, 354), and Ash decided to rescind Keeley's conditional job offer (Appendix 350). Blair's "fish in the sea" message, in conjunction with the reservations surfaced by Karen Ward about Keeley's communication and "teaming" skills, caused Ash to determine that he should interview more job candidates before hiring anyone to fill Cisco's Major Account Manager position (Appendix 353, 354). Ultimately, Ash would conduct approximately 22 job interviews before selecting internal-hire William Davenport for the Cisco Systems Major Account Manager vacancy (Appendix 344, 352).

**D.    Blair Learns of Keeley's Protected Activity.**

Kevin Blair first learned about Keeley's charges of race discrimination and retaliation from Linda Linder at a Sun Microsystems' United States Sales Managers' meeting in Chicago, Illinois on or about July 17, 2000, after Keeley had filed his second, July 5, 2000 charge of discrimination and retaliation against Sun and Cisco Systems (Appendix 178, 230). Before then, Blair was only aware of complaints by Keeley relating to the commission compensation issue (Appendix 178). Before Linder told Blair about the EEOC charges, Blair had no idea that Keeley had filed any charges of discrimination or retaliation with the EEOC, or that Keeley had made any complaint involving racism to anyone in the Sun HR Department (Appendix 178).

When Linder told Blair about Keeley's discrimination and retaliation charges, Blair appeared to Linder to be genuinely surprised by the allegations (Appendix 230).

## IV. ARGUMENTS AND AUTHORITIES

**A.** **Keeley's Motion for Partial Summary Judgment on the Declaratory Judgment Fails as a Matter of Law.**

Sun Microsystems and Cisco are immune from any common law claims by Keeley pursuant to the specific terms and conditions of his application for employment with Cisco Systems (Appendix 168-170). In the Cisco job application dated May 25, 2000, Keeley signed a disclosure authorization and release for background information, which included the following waiver of claims against Cisco and Sun Microsystems:

> I unconditionally release and hold harmless any individual, corporation, or private or public entity from any and all causes of action that might arise from furnishing to Cisco Systems, Inc. and the outside agency (providing background information to Cisco) information that they may request pursuant to this release. (Appendix 168-170).

**1.** **The Release is not in Violation of Public Policy.**

Texas courts have examined the issue of whether releases of claims comparable to the one contained in the Cisco job application violate public policy, and have resoundingly held that such releases do not violate public policy. Contrary to the out-dated and irrelevant cases cited in plaintiff's partial summary judgment brief, contemporary case law demonstrates that releases of claims contained in employment applications and agreements do not constitute violations of public policy.

As stated in Cisco's Motion for Summary Judgment (filed March 5, 2003), the Texas Supreme Court recently held that agreements between employers and employees are not rendered unconscionable due to the disparity of bargaining power between the parties. *In re Halliburton*, 80 S.W.3d 566, 572 (Tex. 2002) (upholding an employer-employee arbitration

agreement). Recently, Northern District Judge Barefoot Sanders applied the *Halliburton* decision to find that an employee's inability to negotiate or amend the City of Dallas' employee liability policy was not an unconscionable violation of public policy, and dismissed Plaintiff's claim for a declaratory judgment that the policy must be revised. *Curlin v. Maples*, 2003 U.S. Dist. Lexis 3431*, *8 – 10 (N.D. Tex. March 7, 2003) (Sanders, J.). These authorities demonstrate that Plaintiff's public policy argument fails as a matter of law, and Plaintiff's common law claims may be dismissed pursuant to the release of claims in the Cisco job application.

The fact that Texas Labor Code Sections 103.003 and 103.004 (Vernon 2002) release ex-employers from liability for providing background information about ex-employees further demonstrates that Cisco's release of claims is not unconscionable.

By signing this disclosure and accepting its conditions as a term for consideration of the job application, Keeley waived any and all tort claims against Sun which might have otherwise arisen from the statement made to Cisco's Ash by Sun's Blair. *Lawrence v. CDB Servs.*, 44 S.W.3d 544, 548 (Tex. 2001). *Lawrence* upheld the viability of releases of workers compensation and related claims by the employees of non-subscribers who agree to accept specified benefits in lieu of common-law remedies. *Id.* at 553. Similarly, Cisco had the right to require Keeley's waiver of common-law claims pertaining to his job application in exchange for consideration of his employment application.

2.     **The Release Need Not be More Specific.**

As stated in Cisco's Motion for Summary Judgment, a valid release may encompass unknown claims and damages that develop in the future. *Keck, Mahin & Cate v. National Union Fire Ins. Co.*, 20 S.W.3d 692, 698 (Tex. 2000). The fact that Cisco's release of claims did not

articulate the universe of claims Keeley could otherwise assert against Cisco or any provider of background information is therefore irrelevant.

### 3. The Release Did Not Limit Cisco's Sources of Background Information.

Keeley claims that Ash's decision to gather background information from Sun through Blair was beyond the scope of conduct foreseen by the release of job application-related claims. This argument is ridiculous. The release clearly states:

> I unconditionally release and hold harmless any individual, corporation, or private or public entity from any and all causes of action that might arise from furnishing to Cisco Systems, Inc. and the outside agency (providing background information to Cisco) information that they may request pursuant to this release (emphasis added).

(Appendix 170). Here, Ash contacted Blair in Blair's capacity as a representative of Sun to request background information. The fact that Keeley misrepresented to Cisco that Gerry Collins (not Kevin Blair) was his former supervisor and background contact does not invalidate the enforceability of the release (Appendix 173, 168-170). In fact, Keeley's misrepresentation to Cisco about the identity of his Sun supervisor would have been a valid basis for Cisco to reject Keeley's job application for providing false information (Appendix 169).

### B. Keeley's Tortious Interference Claim Fails As a Matter Of Law.

Plaintiff asserts that Sun tortiously interfered with his prospective employment when Blair left the "fish" comment on Ash's voicemail. This claim fails as a matter of law, warranting summary judgment not for Plaintiff but for Sun.

From the outset, it is crucial to recognize that Kevin Blair did not provide a job reference to Cisco or Dean Ash. Contrary to Keeley's assertions, and as demonstrated in Sun's Statement of Undisputed Facts, Blair's voice mail to Ash did not provide a job reference. Instead, Blair stated that he did know Keeley and that Keeley actually reported to Blair for a period of time at

Sun, but Sun's policy was not to give specific references, and that while he was sorry that he could not give a reference, there are a lot of fish in the sea (Appendix 177). This point is crucial to understanding that Blair did not violate Sun's "no-reference" policy limiting managers from providing job references to sources external to Sun.

### 1.  Keeley Cannot Demonstrate a *Prima Facie* Claim of Tortious Interference with Prospective Contracts.

Keeley's brief supporting his partial motion for summary judgment cites to outdated case law rendered moot by the principle of *stare decisis*. Keeley cites to *Sterner v. Marathon Oil Co.*, 767 S.W.2d 688 (Tex. 1989), *Exxon Corp. v. Allsup*, 808 S.W.2d 648 (Tex. App. – Corpus Christi 1991), and *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925 (Tex. 1993) as the relevant authorities on tortious interference with prospective contract. But these cases were all overturned by the Texas Supreme Court's decision in *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001) (See *Sturges* at 724 and 725, citing negatively to *Sterner, Exxon and Browning-Ferris*).

In *Sturges*, the Supreme Court held that "to recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful." The court states that "independently tortious" means "that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort." *Id.* "An actor's personal motivation in doing what he has a legal right to do is irrelevant." *Id.* at 724; see also *Willis v. Sweetheart Cup*, 2002 U.S. Dist. LEXIS 498 * 12 - * 13 (N.D. Tex. 2002)(Boyle, M.). "Conduct that is merely "sharp" or unfair is not actionable and cannot be the basis of an action for tortious interference with prospective relations." *Sturges* at 726.

As discussed in Plaintiff's Brief in Support of Amended Motion for Summary Judgment, the plaintiff in *Willis* asserted claims of retaliation and tortious interference. In addition to

granting summary judgment on the retaliation claim, Magistrate Jane Boyle dismissed the tortious interference claim on summary judgment, finding that Sweetheart's demand that Willis not make delivery to their premises did not constitute tortious interference.

Similarly, Kevin Blair's "fish" comment in his voicemail to Dean Ash did not constitute tortious interference because the comment was neither independently tortious nor unlawful. As stated earlier, the comment did not constitute retaliation in violation of Title VII because Blair did not know of Keeley's January 20, 2000 EEOC charge of discrimination or any internal complaints to Sun (Appendix 178, 229, 230, 257, 296). Moreover, Blair's comment to Ash was truthful and factual, and was not made with malice or ill will. (Appendix 178). Thus, there was no causal link between Keeley's protected activity and Cisco's decision not to hire Keeley.

Nor did Blair's comment to Ash constitute activity for which civil liability may be imposed. Under Texas Labor Code Section 103.003, an employer may disclose information about a current or former employee's job performance to a prospective employer of the current or former employee at the request of the prospective employer or the employee. Tex. Lab. Code Ann. Section 103.003. Pursuant to Texas Labor Code Section 103.004, "an employer who discloses information about a current or former employee is immune from civil liability for that disclosure or any damages proximately caused by that disclosure unless it is proven by clear and convincing evidence that the information disclosed was known by that employer to be false at the time the disclosure was made or that the disclosure was made with malice or in reckless disregard for the truth or falsity of the information disclosed." Tex. Lab. Code Ann. Section 103.004.

In this case, Blair responded to a request from prospective employer Cisco for a job reference regarding Keeley (Appendix 177). Blair's remark that there were "other fish in the sea"

was factual, and based upon his personal knowledge, and not malicious (Appendix 177, 178, 207, 329, 335, 336). Further, he did not know that Keeley had previously complained about discrimination. Therefore, this comment did not constitute false information or information disclosed with malice or reckless disregard for the truth.

*Baty v. Protech Ins. Agency*, 63 S.W.3d 841 (Tex. App. – Houston [14th Dist.] 2002, no pet.) established the following necessary elements for a *prima facie* claim for tortious interference with prospective business relationship: (1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Baty*, 63 S.W.3d at 860. *Baty* notes that the Supreme Court in *Sturges* added an element to the plaintiff's proof of tortious interference with prospective business relationships, *e.g.*, that the defendant's conduct must be independently tortious. *Id.* at 863, citing to *Sturges*, 52 S.W.3d at 726. *Baty* also cites negatively to Plaintiff's disrepute authorities of *Sterner* and *Browning-Ferris*. *Id.* at 861.

Plaintiff Keeley's tortious interference claim must fail because he cannot prove that Kevin Blair's job reference to Dean Ash was an independently tortious or unlawful act. As noted previously, Texas Labor Code Sections 103.003 and 103.004 renders Sun immune from liability for a job reference that is neither false nor made with malice or in reckless disregard for the truth or falsity of the information disclosed. As established above, the information that Blair provided to Ash, specifically that there were "other fish in the sea," was neither false nor made with malice

or in reckless disregard for the truth (Appendix 177). The comment was based upon Blair's personal knowledge of Keeley's job performance and relative skills and deficiencies compared to other potential candidates in the job market (Appendix 178, 207, 329, 335, 336).

The statement on its face is not false but is an entirely accurate statement of fact, that indeed other candidates existed in the job market qualified to perform the position Keeley sought from Cisco (Appendix 177). "There are other fish in the sea" does not rise to the level of malice or ill will, but is in fact a neutral statement identifying nothing more than the reality that other job candidates existed besides Keeley in the marketplace for high technology sales.

2.   **Blair's Remark to Ash Did Not Prevent Keeley from being hired by Cisco or Otherwise Cause Him Damage.**

Further, Keeley cannot show that Kevin Blair's remark to Dean Ash prevented Keeley from being hired by Cisco or otherwise caused damage to him. Asks decision not to hire Keeley was not solely based upon the job reference statement from Kevin Blair; it was also based upon the negative impression Keeley made upon Cisco employee Karen Ward regarding Keeley's apparent deficiencies in communications with her (Appendix 349, 353, 354). The ability to communicate well with Karen Ward was a significant factor in Ash's decision about who would be the right candidate for the Major Account Manager position (Appendix 349, 353, 354). For the foregoing reasons, Keeley's tortious interference with prospective business relationship claim fails as a matter of law.

## V. CONCLUSION

The uncontested facts demonstrate that Keeley is not entitled to a declaratory judgment invalidating the release of claims in the Cisco job application. Keeley is also not entitled to partial summary judgment on his tortious interference claim. Thus, the court should deny Plaintiff's motion for partial summary judgment.

**DEFENDANT SUN MICROSYSTEMS, INC.'S BRIEF IN SUPPORT OF**
**RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**          Page 23 of 25
Ft.Worth/90168.1

## VI.  REQUEST FOR RELIEF

Sun Microsystems respectfully requests that the Court deny Plaintiff's motion for partial summary judgment, and grant Sun Microsystems all other relief to which it may be entitled.

DATED:  March 25, 2003                     Respectfully submitted,

Liane A. Janovsky
State Bar No. 00784330
Lon R. Williams, Jr.
State Bar No. 21603200
Elizabeth Fruin Smith
State Bar No. 24032207

BRACEWELL & PATTERSON, L.L.P.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-3387
Telephone (214) 758-1000
Facsimile (214) 758-1010

ATTORNEYS FOR DEFENDANT
SUN MICROSYSTEMS, INC.

## CERTIFICATE OF SERVICE

I certify that on March 25, 2003, I sent a true and correct copy of the foregoing Defendant Sun Microsystems' Brief in Support of Response to Plaintiff's Motion for Partial Summary Judgment by certified mail, return receipt requested, to Plaintiff's Counsel and to counsel for Defendant Cisco:

    H. Ron White and Tracey R. Wallace
    WHITE & WIGGINS, L.L.P.
    1999 Bryan Street, Suite 3470
    Dallas, Texas 75201

    Steven W. Sloan
    THOMPSON & KNIGHT L.L.P.
    1700 Pacific Avenue, Suite 3300
    Dallas, Texas 75201-4656

                             _____
                             Liane A. Janovsky