

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**FILED**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

APR - 2 2003

CLERK, U.S. DISTRICT COURT
By _____
    Deputy

| | | |
|---|---|---|
| TIMOTHY KEELEY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3-01CV1504-X |
| | § | |
| CISCO SYSTEMS and SUN | § | JURY DEMANDED |
| MICROSYSTEMS | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE TO DEFENDANT SUN
MICROSYSTEM'S MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

**H. RON WHITE**
Bar Card No. 21303500
**KEVIN B. WIGGINS**
Bar Card No. 21441600
**TRACEY R. WALLACE**
Bar Card No. 00797617
1999 Bryan Street
Suite 3470
Dallas, Texas 75201
(214) 665-4150
(214) 665-4170 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**



# TABLE OF CONTENTS

Table Of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    Disputed Issues of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  Background Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      A.    Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      B.    Defendant is not entitled to summary judgment on Keeley's retaliation
            claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
            1.    Retaliation under Title VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
            2.    A material fact issue exists as to the causal connection element of
                  Plaintiff's prima facie case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            3.    Defendant's legitimate non-discriminatory reason is pretext for
                  discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            4.    But for Keeley's protected activity, he would have been hired by
                  Cisco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
            5.    Finally, the Cause Determination issued by the EEOC, as well as the
                  credibility issues of Blair, raise a material fact issue . . . . . . . . . . 24
      C.    Defendant Sun Microsystems tortiously interfered with Plaintiff's prospective
            employment with Cisco Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
            1.    Defendant has applied the wrong legal standard . . . . . . . . . . . . . 25
            2.    Applying the correct legal standard, there is, at a minimum, a material fact
                  issue as to whether Defendant tortiously interfered with Plaintiff's
                  prospective employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
                  **Keeley and Cisco Systems would have entered into a contractual
                  relationship** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
                  **Keeley Blair intentionally interfered with Keeley's employment
                  with Cisco Systems** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
                  **Plaintiff suffered actual harm because of the interference** . . 31
            3.    Assuming arguendo that the *Sturges* standard does apply, Plaintiff can
                  allege an independently tortious or unlawful act . . . . . . . . . . . . . 32
      D.    Plaintiff has not released his tortious interference claim . . . . . . . . . . . . 32
            1.    The provision does not specify which claims are to be waived . . 33
            2.    The release only applies to information supplied to Cisco <u>and</u> the outside
                  agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
            3.    The release provision is contrary to public policy . . . . . . . . . . . 35

E.   There is a material fact issue as to Plaintiff's breach of contract claim . . 36

F.   The After-Acquired Evidence Doctrine does not apply . . . . . . . . . . . . . 37

G.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Certificate Of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF AUTHORITIES

### Federal Cases

*Addickes v. S.H. Kress & Co.,* 389 U.S. 144 (1970) .................................................................. 14

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986) ................................................. 13, 14

*Borner v. Zale Lipshy University Hospital,* 2002 WL 449576 (N.D.Tex. 2002) ................. 27, 28

*Burgos v. Southwestern Bell Telephone Co.,* 20 F.3d 633, 635 (5th Cir. 1994) ........................... 14

*Dibidale of La., Inc. v. American Bank & Trust Co.,* 916 F.2d 300, 307-308)(5th Cir. 1990) ... 20

*Evans v. City of Houston,* 246 F.3d 344, 354 (5th Cir. 2001) ..................................................... 16

*Fields v. Phillips Sch. of Tech.,* 840 F.Supp. 149 (W.D.Tex. 1994) ...................................... 20, 21

*Harvey v. Chevron USA, Inc.,* 961 F.Supp. 1017, 1032 (S.D.Tex. 1997) ................................... 20

*Jacobs v. Reno,* 1999 WL 155708 (N.D. Tex. 1999) .................................................................. 20

*Kennedy v. Silas Mason Co.,* 334 U.S. 249 (1948) ...................................................................... 14

*Khanna v. Park Place Motorcars of Houston, Ltd.,* 2000 WL 1801850 (N.D. Tex.) ............ 20, 24

*Kiepfer v. Beller,* 944 F.2d 1213, 1220 (5th Cir. 1991) ............................................................ 28

*Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir. 1996) ........................................................ 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986) ...................... 14

*McBroom v. City of Amarillo,* 2001 U.S.Dist.LEXIS 13855 (N.D.Tex. 2001) ........................... 21

*McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352 (1995) ........................................ 37

*Raggs v. Mississippi Power & Light Co.,* 278 F.3d 463, 471 (5th Cir. 2002) .............................. 16

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000) ................................. 15, 20

*Seaman v. CSPH, Inc.,* 179 F.3d 297, 301 (5th Cir. 1999) .......................................................... 20

*Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 405 (5th Cir. 1999) ................................ 14

*Shattuck v. Kinetic Concepts, Inc.,* 49 F.3d 1106 (5th Cir. 1995) ................................................ 37

*Smith v. Universal Servs.,* 454 F.2d 154 (5th Cir. 1972) ........................................................ 20, 24

*Taylor v. Beacon Industries,* 2001 WL 1029477 (N.D.Tex. 2001) ........................................ 23, 28

*Tex. Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981) ..................................... 15

*Turpen v. Missouri-Kan.-Tex.R.R. Co.,* 736 F.2d 1022, 1026 (5th Cir. 1984) ........................ 20, 24

*Tutton v. Garland Indep. Sch. Dist.,* 733 F.Supp. 1113, 1116 (N.D.Tex.1990) .......................... 15

*Willis v. Sweetheart Cup,* 2002 U.S.Dist. LEXIS 498 (N.D.Tex. 2002) ................... 23, 24, 26, 27

## State Cases

*Allright, Inc. v. Elledge,* 515 S.W.2d 266, 267 (Tex. 1974) ................................................... 35, 36

*Baty v. Protech Ins. Agency,* 63 S.W.2d 841 (Tex.App.–Houston [14th Dist.] 2002, no pet.) 26, 27

*Browning-Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex. 1993) ............................................. 30

*Crowell v. Housing Auth.,* 495 S.W.2d 887, 889 (Tex. 1973) ................................................. 35, 36

*Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 422 (Tex. 1984) ............................................. 33

*Exxon Corp. v. Allsup,* 808 S.W.2d 648 (Tex.App.--Corpus Christi 1991, writ denied) ............. 29

*Gulf Liquid Fertilizer Co. v. Titus,* 354 S.W.2d 378, 385 (Tex. 1962) ......................................... 32

*Hutchins v. Slemons,* 174 S.W.2d 487, 489 (Tex. 1943) .............................................................. 32

*Larson v. Family Violence and Sexual Assault Prevention Center of South Texas,* 64 S.W.3d 506
(Tex.App.– Corpus Christi, 2001, pet. denied) .................................................................. 27, 28

*Lawrence v. CDB Services, Inc.,* 44 S.W.3d 544 (Tex. 2001) ................................................. 33, 34

*Republic National Bank of Dallas v. Northwest National Bank of Fort Worth,* 578 S.W.2d 109
(Tex. 1978) ................................................................................................................................. 34

*Solis v. Evins,* 951 S.W.2d 44(Tex.App.–Corpus Christi 1997, no pet.) ...................................... 36

*Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex. 1989) ........................................... 28, 29

*Trinity Industries, Inc. v. Ashland, Inc. and ATEC, Inc.,* 53 S.W.3d 852 (Tex.App.–Austin 2001,
pet. denied) ................................................................................................................................. 33

*Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 938 (Tex. 1991) ..................................... 33

*Wal-Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711 (Tex. 2001) .................................. 25, 26, 27, 32

**State Statutes**

*Tex.Lab.Code Ann.* § 103.002 (Vernon 2002) ............................................................................. 31

*Texas Labor Code Ann.* Sections 103.003-004 ........................................................................... 31

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TIMOTHY KEELEY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3-01CV1504-X |
| | § | |
| CISCO SYSTEMS and SUN | § | JURY DEMANDED |
| MICROSYSTEMS | § | |
| | § | |
| Defendants. | § | |

PLAINTIFF'S BRIEF IN SUPPORT OF  RESPONSE TO DEFENDANT
SUN MICROSYSTEM'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, Timothy Keeley (hereinafter "Plaintiff" or Keeley"), and files this

Brief in Support of Response to Defendant's Motion for Summary Judgment," (hereinafter "Plaintiff's

Response") pursuant to Local Rule 56.4.  In support of this Response, Plaintiff shows the following:

I.

DISPUTED ISSUES OF FACT

1.      Whether Defendant intentionally discriminated against Keeley because of his opposition

to practices outlawed by Title VII?

2.      Whether Defendant tortiously interfered with Plaintiff's prospective employment

with Defendant Cisco' Systems?

3.      Whether Defendant Sun Microsystems breached a contract with Plaintiff when

Plaintiff's Brief in Support of Response
to Defendant's Motion for Summary Judgment - Page 2

it failed to pay him commissions earned under Sun Microsystem's Sales Plan?

    4.    Whether Defendant's after-acquired evidence defense fails as a matter of law because the employment at issue in this case is employment with Cisco Systems, not Sun Microsystems and Defendant is before this court with unclean hands?

## II.

## SUMMARY OF ARGUMENT

Defendant is not entitled to summary judgment regarding Keeley's retaliation claim because there is a material fact issue as to when Kevin Blair was made aware of Keeley's protected activity. Specifically, because of numerous inconsistencies in his testimony, Kevin Blair possesses credibility issues that undermine his contention that he was unaware of Plaintiff's protected activity at the time he provided the negative reference to Cisco.

Next, Defendant is not entitled to summary judgment regarding Keeley's claim for tortious interference with prospective employment. Defendant has applied the wrong legal standard regarding this cause of action. Applying the correct legal standard, there is, at a minimum, a material fact issue regarding Keeley's tortious interference claim. Moreover, Keeley has not released his tortious interference claim against Defendant.

A material fact issue also exists regarding Keeley's breach of contract claim. Specifically, it is undisputed that Keeley has not been paid 100% commission for sales made during FY '99. Finally, Defendant's application of the after-acquired evidence doctrine fails as a matter of law.

**Plaintiff's Brief in Support of Response**
**to Defendant's Motion for Summary Judgment - Page 3**

## III.

## BACKGROUND FACTS

1.        Tim Keeley had been employed by Sun Microsystems as a salesman.  *See*

*Appendix* p. 1. Effective July 1, 1999, Kevin Blair became Keeley's manager at Sun Microsystems.

*See Appendix* pp. 1, 74.  Prior to Blair becoming Keeley's supervisor, Keeley had been attempting to

get compensation for products he had sold to a reseller, Verio, who was also an end-user client of Sun.

Over two million dollars ($2,000,000.00) of end-user equipment were sold to Verio in FY '99.  *See*

*Appendix* p. 173.  Verio was an Internet Service Provider (ISP).  *See Appendix* pp. 165-166.  As

such 200%  dual credit was available for sales to this client. *See Appendix* pp.  252-253, 273.

2.        According to Sun's FY '99 Sales Compensation Plan, Keeley earned a commission for

the sale of end user products if the client was listed on Keeley's goal sheet. *See Appendix* pp. 174-

176.  Verio was listed on Keeley's FY' 99 goal sheet. *See Appendix* p. 76  Accordingly, Keeley was

entitled to receive credit for the two million dollars ($2,000,000.00) worth of equipment sold to Verio.

*See Appendix* pp. 174-176.  Moreover, Keeley was repeatedly informed that he would be credited

with 100% compensation for Verio end-user purchases.  *See Appendix* pp.  174-176.  Keeley,

however, was not awarded the compensation due under the Sales Compensation Plan. *See Appendix*

pp. 178-180  Blair initially supported Keeley and thought that Keeley had been performing in the best

interest of the company.    *See Appendix* p. 178.  Blair, however, recommended that Keeley be

awarded only a fraction of the total compensation earned by Keeley pursuant to the Sales Plan. *See*

*Appendix* p. 178.

3.      Had Keeley been credited with the full amount due under the Sales Plan, he would have reached 100+% of his plan goal which would have resulted in a commission payment of more than sixty thousand ($60,000.00) dollars. *See Appendix* p. 2. Keeley complained of unfair treatment and escalated his issue to management above Kevin Blair. *See Appendix* pp. 111-113, 164.

4.      As an employee of Sun, Keeley consistently met and surpassed his goals. Defendant, in an attempt to mislead this Court, spends more than several pages of its brief detailing the alleged performance issues of Keeley. These alleged deficiencies, however, amount to no more than "smoke and mirrors" on the part of the defense. Specifically, although Plaintiff allegedly suffered from serious performance issues, he was never disciplined by Defendant. *See Appendix* pp. 80-81. Defendant alleges the following unsubstantiated performance issues:[1]

| **ALLEGED PERFORMANCE ISSUES** | **ORAL DISCIPLINE ISSUED** | **WRITTEN DISCIPLINE ISSUED** |
|---|---|---|
| Complaints from the travel department regarding Keeley | No | No |
| Misrepresentation of his work and achievements | No | No |
| Maintenance of poor or no records by Keeley | No | No |
| Failure to achieve sales goals | No | No |

---

[1] These "performance issues" only arose after Keeley continuously complained about compensation issues. *See Appendix* p. 79.

Plaintiff's Brief in Support of Response
to Defendant's Motion for Summary Judgment - Page 5

| ALLEGED PERFORMANCE ISSUES | ORAL DISCIPLINE ISSUED | WRITTEN DISCIPLINE ISSUED |
|---|---|---|
| Does not possess many of the essential skills of a good salesman | No | No |
| Told lies about sales activities and other business related activities | No | No |

Instead, the following undisputed facts characterize Keeley's performance at Sun:

- Keeley was continuously praised by his supervisor of two years, Gerry Collins;

- Keeley performed in the best interest of the company; and

- Keeley was issued retention stock by Sun. Retention stock is issued by the company to employees the company wants to retain and for good performance. *See Appendix* pp. 1-2, 97, 178.

5.     After Keeley insisted that he be fully compensated, Blair began severely scrutinizing Keeley's work and business trips. *See Appendix* pp. 2, 111-113. Keeley complained to Blair that he believed Blair was retaliating against him because of his complaints. *See Appendix* pp. 108, 111-113. Keeley also complained that he was being treated differently than his coworkers. *See Appendix* pp. 111-113. Furthermore, Keeley complained about Blair's treatment to Human Resources, copying Blair via email. *See Appendix* pp. 111-113. As Blair continued to harass Keeley, Keeley became suspicious that the lack of fair compensation and the treatment by Blair was due to his race, African American. *See Appendix* pp. 2, 114-115.

6.     In late 1999/January 2000, Keeley learned that other black salesmen within the

company were experiencing the same issues with fair compensation or commissions earned. *See Appendix* pp. 114-115. In January 2000, Keeley complained to Human Resources that he was not fairly compensated because of his race. *See Appendix* pp. 114-115.

7. In his last meeting with Blair, Keeley informed Blair that he would be pursuing the compensation issue and asked Blair who was his [Keeley's] EEO representative within the company. *See Appendix* p. 2. Blair informed Keeley that Vicky Yee was his EEO representative. *See Appendix* p. 2. Thereafter, Keeley contacted Vicky Yee regarding his complaints. *See Appendix* pp. 2, 117-119. Keeley, however, rather than continue to face continued unfair treatment from Blair, resigned his position with Sun Microsystem in January 2000. *See Appendix* p. 2. At the time of his resignation, Blair had been his manager for approximately six (6) months, three of which Blair had been traveling. *See Appendix* p. 2.

8. On January 20, 2000, Keeley filed a Charge of Discrimination with the Equal Employment Opportunity Commission, complaining of the treatment he received from Sun Microsystems. *See Appendix* p. 120. Keeley specifically complained about the unfair treatment he received from Kevin Blair. *Id.*

9. Blair contends that he did not know of any charge of discrimination filed by Keeley until mid-July 2000 when he was informed of a complaint by Linda Linder in Chicago. *See Appendix* pp. 88-89.

10. Blair, however, received a request from his legal department regarding a compensation issue. *See Appendix* pp. 144-145. Blair requested that Don Deason supply the information requested by the legal department. *See Appendix* pp. 144-145. Blair admits this issue involved Keeley. *See Appendix* p. 98-100. Furthermore, on June 30, 2000, counsel for Sun

Microsystems sent a letter to the EEOC answering a second request for information by the EEOC regarding Keeley's race discrimination charge. *See Appendix* pp. 146-148. In the letter, counsel indicates that she had spoken to Kevin Blair about an oral request Keeley made to transfer to another position within the company and that Blair's response was that he remembered the oral request but that Keeley had not submitted a written request. *See Appendix* pp. 147-148. This letter to the EEOC is evidence that Blair was informed about Keeley's discrimination claim prior to June 30, 2000; well before the middle of July 2000.

11.     After his employment with Sun Microsystems ended, Keeley was contacted by Cisco Systems and invited to apply for the position of Major Account Manager in Dallas, Texas. *See Appendix* p. 2.

12.     Cisco's previous Major Account Manager in Dallas, Texas, Mr. Ferguson, had communication problems with his counterpart in Oklahoma, Karen Ward. *See Appendix* pp. 42-43. Despite Ms. Wards complaints from the beginning of their working relationship, this problem persisted for approximately (1) one year. *See Appendix* pp. 42-43. Mr. Ferguson was not removed from this position, however, until after a major client complained about communications issues with Mr. Ferguson. *See Appendix* pp. 42-43.

13.     The Major Account Manager position at Cisco Systems is the pre-eminent position in the installation sales industry. *See Appendix* p. 2. At 100% of commission plan total, the Major Account Manager earns $250,000.00 per year. *See Appendix* p. 6. "Major Accounts" in Cisco's Dallas region consists of approximately 25 large customers with worldwide business initiatives, which are serviced by five Major Account Managers. *See Appendix* p. 149.

14.     The largest account in the Dallas region is Sabre/American Airlines which purchases tens of millions of dollars worth of equipment from Cisco per year. *See Appendix* p. 149. The products include the full line of enterprise networking products, from switches and routers to application software. *See Appendix* p. 149.

15.     For the Dallas Major Account Manager position, the recruiting process consisted of a first stage where sales recruiter Michelle Joyce, reviewed resumes for the minimum background and experience criteria set by Dean Ash, the supervisor of the Dallas-area Major Account Managers. *See Appendix* pp. 9-10. Ms. Joyce performed a telephone screening interview with Mr. Keeley. She formed a favorable impression of Keeley and forwarded his resume to Mr. Ash. *See Appendix* pp. 9-10.

16.     Mr. Ash scheduled an interview with Keeley for May 22, 2000. Mr. Ash interviewed Keeley and found him to be a strong candidate for the position. *See Appendix* pp. 12, 49-50. Keeley was the seventeenth candidate Ash had interviewed for the position. *See Appendix* p. 16. Keeley was the only individual out of the seventeen candidates rated as qualified for the position by Dean Ash, belying Defendant's argument that Keeley was a salesman of marginal skill. *See Appendix* p. 16. After the interview, Keeley completed an application for the position of Major Account Manager. *See Appendix* pp. 3, 62-64. Contained within the application for Major Account Manager is a provision which indicates that a background check would be conducted. *See Appendix* p. 64. The application also contains language allegedly releasing claims arising from the background check that is conducted. *See Appendix* p. 64.

17.     Based upon his interview with Keeley, Mr. Ash scheduled a full round of interviews for

Keeley on May 25, 2000, including in-person interviews with Mr. Ash's supervisor, a colleague of Mr. Ash in another department, and a lunch with two sales engineers. *See Appendix* p. 13. Mr. Ash received positive feedback from these interviews. *See Appendix* p. 14.

18.     On May 30, 2000, Mr. Ash scheduled an interview for Keeley with Karen Ward, the Tulsa, Oklahoma, Major Accounts Manager. *See Appendix* p. 68. Ms. Ward was satisfied with Keeley's qualifications and experience. *See Appendix* p. 51. Furthermore, during his interview with Ms. Ward, Keeley satisfactorily answered every question that Ward asked and also asked questions himself. *See Appendix* pp. 50-51.

19.     On May 30, 2000, Keeley was sent a  letter agreement offering him the exempt position of Major Accounts Manager at grade level 500 in the Dallas, Texas, office. *See Appendix* p. 69.   The letter agreement defined the terms and conditions of his employment with Cisco. *See Appendix* pp. 70-71. Keeley was informed that the job was his and that the only thing left to conclude was verification of references he listed in his employment application and a background check. *See Appendix* p. 3.  Kevin Blair was not among the references listed by Keeley. *See Appendix* p. 63.

20.     As requested, Keeley completed, signed and returned the letter agreement to Cisco. *See Appendix* p. 71.  Cisco Systems contracted with HireRight.com to perform the background investigation. *See Appendix* pp. 65-67. HireRight.com investigated Keeley's background and contacted his references. *See Appendix* pp. 65-67. HireRight.com reported to Cisco that Keeley's background and references were satisfactory. *See Appendix* p. 65.

21.     Thereafter, upon requesting his start date,  Keeley was informed by Michele

Joyce, a HR employee for Cisco, that despite the executed letter agreement, Cisco was not going to hire Keeley for the position of Major Accounts Manager. *See Appendix* p. 3. He was informed that he was not going to be hired because of something that had surfaced in his background check. *See Appendix* p. 3. Keeley inquired about the information that had apparently surfaced, however, he did not receive a response. *See Appendix* p. 3. Keeley reviewed the background report he had received from HireRight.com and found nothing negative. *See Appendix* pp. 65-67.

22.     On or about June 2, 2000, Dean Ash had a conversation with Ms. Ward which lasted several minutes. During this conversation Ms. Ward commented upon what she perceived to be a lack of eye contact by Keeley. *See Appendix* pp. 30, 54. Despite this "issue", Ms. Ward indicated to Dean Ash that she could work with Mr. Keeley. *See Appendix* p. 55.   At no time did Ms. Ward ever indicate to Dean Ash that she could not work with Keeley. *See Appendix* p. 55.

23.     On or about June 6, 2000, Kevin Blair, Plaintiff's former supervisor at Sun Microsystems contacted Dean Ash and told Mr. Ash, in response to Mr. Ash's inquiry whether Cisco should hire Keeley, that Ash should "pass on Keeley and continue his search for a candidate." *See Appendix* pp. 151, 363.   Mr. Blair's comments were in violation of Sun's reference policy. *See Appendix* pp. 84-85, 102, 154-156.

24.     Immediately thereafter, in a June 6, 2000, email to Michele Keetch, a HR representative for Cisco, Mr. Ash communicated that he wished to remove Keeley from consideration for the position of Major Accounts Manager based upon information he had received from a confidential source regarding Keeley's <u>exit</u> from Sun. *See Appendix* p. 72. [emphasis added]. Mr. Blair was the confidential source. *See Appendix* p. 29.   In this email, Mr. Ash never mentioned the

information he received from Karen Ward as a basis for removing Keeley from consideration for the

position of Major Accounts Manager.  *See Appendix* p. 72.

25.     Defendant, however, alleges that Keeley was not hired in large part because of a

communication issue with Karen Ward.  A timeline of the important facts of this case clearly indicates

that Keeley was not hired because of a negative reference given by Kevin Blair:

| May 25th, 2000 | Keeley interviews with Dean Ash |
|---|---|
| May 25th, 2000 | Keeley interviews with Cisco personnel and receives favorable reviews |
| May 30th, 2000 | Keeley interviews with Ward and receives a favorable review |
| May 30th, 2000 | Keeley receives offer letter from Cisco |
| June 2nd, 2000 | Ash receives additional information from Ward regarding interview |
| June 2nd, 2000 | Cisco receives HireRight.com report which shows nothing negative |
| June 6th, 2000 | Ash receives negative reference from Blair |
| June 6th, 2000 | Ash removes Keeley from consideration for the position of Major Accounts Manager |

26.     Unable to receive an explanation for Cisco's actions, Keeley filed a Charge of

Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 5, 2000,

claiming that he had been retaliated against for engaging in protected activity.  *See Appendix* p. 157.

27.     Shortly after Keeley filed his Charge of Discrimination, Mr. Blair and Mr. Ash

met for lunch at Tony Roma's. Keeley's charge of discrimination was a topic of conversation. *See Appendix* p. 20. Mr. Blair states, however, that he did not discuss the charge with Ash and that he has only discussed Keeley's charge of discrimination when his attorneys have been present. *See Appendix* p. 89, 104.

28.     On March 8, 2001, the EEOC issued a determination that there was reasonable cause to believe Keeley had been retaliated against by Defendants. *See Appendix* pp. 158-163.

29.     In its Responses to Plaintiff's First Set of Interrogatories, Defendant denied that Kevin Blair had given Plaintiff a negative reference. *See Appendix* p. 341-342. It was only after Cisco Systems, in its Responses to Plaintiff's First Set Interrogatories, revealed that Blair had informed Cisco that it should "give Keeley a pass," that Sun actually admitted to the negative reference by Blair. *See Appendix* pp. 363, 403-404.

**IV.**

**ARGUMENTS AND AUTHORITIES**

Sun has not proven the absence of a material fact issue. Accordingly, summary judgment should be denied.

**A.     Standard for Summary Judgment**

In reviewing summary judgment, the moving party has the burden of establishing that no material fact issue exists and it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). In determining whether a disputed material fact issue precludes summary judgment, a court must take evidence favorable to the nonmovant as true, and indulge every

reasonable inference in favor of the nonmovant. *See Burgos v. Southwestern Bell Telephone Co.,* 20 F.3d 633, 635 (5th Cir. 1994)(citing *Anderson* 477 U.S. at 248, 106 S.Ct. at 2510).

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or a motion for directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986)(citing *Addickes v. S.H. Kress & Co.,* 389 U.S. 144 (1970)). Neither should the trial court act other than with caution in granting summary judgment. The trial court should deny summary judgment in a case where there is reason to believe that the better course would be to proceed to full trial. *Kennedy v. Silas Mason Co.,* 334 U.S. 249 (1948); *Anderson v. Liberty Lobby,* supra.

While the mere allegation of the existence of a dispute over material facts is not sufficient to defeat a motion for summary judgment, if the evidence shows that a reasonable jury could return a verdict for the non-moving party, the dispute is genuine. *Anderson,* 477 U.S. at 247-248.

**B.      Defendant is not entitled to summary judgment on Keeley's retaliation claims**

  *1.      Retaliation under Title VII*

Title VII provides that an employer commits an unlawful employment practice if the employer retaliates or discriminates against a person who opposes a discriminatory practice. *See Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 405 (5th Cir. 1999). A plaintiff establishes a *prima facie* case of retaliation by showing: (1) he was engaged in a protected activity, (2) an adverse

employment action occurred; and (3) there was a causal connection between the participation in the protected activity and the adverse employment decision. *Id.* at 408-09. The establishment of a *prima facie* case gives rise to an inference of retaliation. *Id.* Once a Plaintiff has established a *prima facie* case of discrimination, a Defendant must provide a legitimate non-discriminatory reason for its actions. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000).

Once a Defendant meets this production burden, a Plaintiff must prove by a preponderance of the evidence that the reasons offered are not the true reasons but are a pretext for discrimination. *Id.* "[T]he plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* at 143 (quoting *Tex. Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981)).

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. "[I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* At the summary judgment stage, a Plaintiff need only raise a genuine issue of material fact. *See Tutton v. Garland Indep. Sch. Dist.,* 733 F.Supp. 1113, 1116 (N.D.Tex.1990) (Fitzwater, J.).

In the present case, the following facts are undisputed:

> **Keeley had a bad relationship with his supervisor, Kevin Blair, at Sun Microsystems and resigned in January 2000.** *See Appendix* **pp. 2, 108, 111-113.**

> **Keeley filed a charge of discrimination with the EEOC on January 20, 2000, complaining of race discrimination at Sun Microsystems and the treatment he received from Kevin Blair.** *See Appendix* **p. 120.**

> **In May 2000, Keeley was hired by Cisco Systems as the Major Accounts Manager for Dallas, Texas, subject to the successful completion of reference check and background investigation.** *See Appendix* **p. 70-71.**

> **Kevin Blair, in response to an inquiry from Dean Ash as to whether Cisco Systems should hire Keeley, stated that "there were other fish in the sea."** *See Appendix* **pp. 17, 84.**

> **Tim Keeley was removed from consideration for the position of Major Accounts Manager for Dallas, Texas.** *See Appendix* **p. 72.**

The only issue left to resolve at the summary judgment stage is whether retaliation is the reason why Keeley was removed from consideration for the position of Major Accounts Manager. Defendant argues that summary judgment should be granted because Keeley cannot satisfy the third element of the *prima facie* case, the causal connection between the protected activity and the adverse employment action.

> 2.    *A material fact issue exists as to the causal connection element of Plaintiff's prima facie case*

The standard for establishing the "causal link" element of the plaintiff's *prima facie* case is much less stringent than the ultimate "but for" standard necessary to prevail in a Title VII case. *Id., See also Raggs v. Mississippi Power & Light Co.,* 278 F.3d 463, 471 (5th Cir. 2002); *See also Evans v. City of Houston,* 246 F.3d 344, 354 (5th Cir. 2001). "[A] plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link'

element of a *prima facie* case." *See Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir. 1996). A plaintiff merely needs to show some connection between the protected activity and the adverse employment action in order to establish a *prima facie* case of retaliation.

Sun Microsystems contends that Kevin Blair had no knowledge of Plaintiff's protected activity at Sun Microsystems.[2]  However, there is circumstantial evidence to the contrary.  Specifically, on numerous occasions, Keeley complained about Blair's unfair treatment, copying Blair via email. *See Appendix* pp. 111-113  Furthermore, Keeley informed Blair that he would pursue the compensation issue and also requested from Blair the name of the EEO officer, thus making Blair well aware that he intended to approach Ms. Yee with an EEO issue. *See Appendix* p. 2.

In addition, according to Sun Microsystem's harassment policy, once a charge of discrimination is received by the Human Resource department, the supervisor of the employee is to be contacted regarding the issue. *See Appendix* pp. 121-135.  Blair, as well as Linder, Yee and Rogers, contend that despite company policy to the contrary, he was never contacted regarding Keeley's charge of discrimination. *See Defendant Appendix* pp. 177, 337, 349, 350-351.

However, the position statement submitted to the EEOC on Sun Microsystem's behalf contained information specifically related to Keeley's relationship with Blair, as well as personal observations of Blair regarding Keeley. *See Appendix* pp. 136-140. When asked if the information contained within the

---

[2] Defendant contends that Kevin Blair did not know of Plaintiff's protected activity because he was not informed by either Linda Linder, Vicky Yee or Elke Rogers of Keeley's charge of discrimination. *See Defendant's brief* p. 8.  However, this contention does not rules out the possibility that someone else informed Blair of Keeley's charge of discrimination as indicated by Lori Middlehurst's letter to the EEOC. *See Appendix* pp. 146-148.

position statement was accurate, Blair responded that it was accurate, but that he had never been contacted for the information. *See Appendix* p. 91.

Finally, Kevin Blair possesses credibility issues that undermine his contention that he was not aware of Keeley's protected activity:

| Statements made by Kevin Blair in his deposition | Statements later changed by Blair in his deposition or where contrary information was received |
|---|---|
| Keeley did not make a claim of retaliation. *See Appendix* p. 82. | Blair wrote an email to HR describing a retaliation issue raised by Keeley. *See Appendix* p. 108. |
| Mr. Blair has only discussed Keeley's charge of discrimination with his attorneys present. *See Appendix* pp. 89, 104. | Mr. Ash stated that Mr. Blair had discussed Keeley's charge of discrimination with him over lunch at Tony Roma's. *See Appendix* p. 20. |
| Keeley did not state concerns to Blair about how he was being treated by Blair. *See Appendix* p. 96. | Keeley sent Blair an email which outlined the fact that Keeley believed that Blair was singling him out. *See Appendix* pp. 111-113. |
| Blair did not know about Keeley's race discrimination claim filed in January 2000; a claim which encompassed Keeley's compensation issue. *See Appendix* pp. 88-89 | Blair received a request from legal requesting information regarding the compensation issue. This subsequent information was provided to the EEOC on June 30, 2000. *See Appendix* pp. 144-145. |
| The first time Blair was aware of any kind of complaint filed against Sun by Keeley was in the July 2000 time frame when he was informed of the complaint by Linda Linder. *See Appendix* pp. 88-89. | Blair received a request from legal requesting information regarding the compensation issue. This subsequent information was provided to the EEOC on June 30, 2000. *See Appendix* pp. 144-145. |
| Blair has not had discussions with anyone regarding Keeley's complaint without his attorneys present. *See Appendix* pp. 89, 104. | Blair received a request from legal requesting information regarding the compensation issue; Blair requested that Don Deason supply the information. *See Appendix* pp. 144-145. |

| | |
|---|---|
| The first time Blair was ⬤re of any kind of complaint filed against Sun by Keeley was in the July 2000 time frame when he was informed of the complaint by Linda Linder. *See Appendix* pp. 88-89. | In a June 30, 200⬤tter to the EEOC , counsel for Sun Microsystems indicates that she had spoken with Blair about Keeley's request to transfer to another position. *See Appendix* pp. 147-148. |
| Kevin Blair stated he did not know what position Vicky Yee occupied for Sun. *See Appendix* p. 86. | Kevin Blair told Keeley that Vicky Yee was the EEO representative. *See Appendix* p. 2. |

As shown above, Kevin Blair possess credibility issues which call into question the truthfulness of statements offered in support of Defendant's motion for summary judgment that he was unaware of Keeley's previous protected activity when the adverse employment action occurred. Specifically, two pieces of evidence, in particular, call into question the veracity of Kevin Blair as to when he was made aware of Keeley's protected activity.

The first piece of evidence is the email question Blair received from legal regarding the compensation issue. *See Appendix* pp. 144-145. It is undisputed that this request pertains to Keeley and his compensation issue and that Blair was asked to provide information to legal. *Id.* This email directly contradicts Blair's statement that he has only discussed Keeley's complaints when his attorneys have been present. *See Appendix* pp. 88-89.[3] The second piece of evidence is the June 30, 2000, letter sent to the EEOC by Sun. *See Appendix* pp. 146-148. This letter was written in response to a May 24, 2000, request for information by the EEOC. *See Appendix* pp. 141-142. The letter reveals that counsel for Sun discussed Keeley's request for a transfer with his manager at the time of Keeley's request, Kevin Blair, and that Blair recalled the request made by Keeley. *See Appendix* pp. 147-148. This letter directly contradicts Blair's statement that he was not aware of Keeley's complaint until mid-

---

[3]  Elke Rogers and Don Deason are not attorneys for Sun.  Furthermore, this email also calls into question the veracity of Elke Rogers who has sworn that she has not discussed Keeley's claims with Blair.  *See Defendant's Appendix* p. 257.

July 2000. This evidence plainly indicates that, at the latest, Blair was made aware of Keeley's claim between May 24, 2000, and June 30, 2000, encapsulating the June 6, 2000, date.[4] A jury, faced with evidence that clearly calls into question the veracity of Blair regarding a central issue of the case, could return a verdict in favor of Plaintiff.

Because this pivotal individual has credibility issues, summary judgment must be denied. Specifically, "a court cannot resolve credibility issues at the summary judgment stage and must deny summary judgment if genuine credibility issues are present." *See Jacobs v. Reno,* 1999 WL 155708 (N.D. Tex. 1999)(citing *Dibidale of La., Inc. v. American Bank & Trust Co.,* 916 F.2d 300, 307-308)(5th Cir. 1990)(credibility assessments are not grist for the summary judgment mill).

    *3.    Defendant's legitimate non-discriminatory is a pretext for discrimination*

Once the plaintiff establishes the *prima facie* case, the burden of producing some non-retaliatory reason for its action falls upon the defendant. *See Harvey v. Chevron USA, Inc.,* 961 F.Supp. 1017, 1032 (S.D.Tex. 1997). The Fifth Circuit has instructed that ultimately, to prove a retaliation case, the plaintiff must establish that "but for the protected activity, the adverse employment action would not have occurred." *See Seaman v. CSPH, Inc.,* 179 F.3d 297, 301 (5th Cir. 1999). If the plaintiff presents additional evidence that the reason given by the employer for the adverse action is false or pretextual, "a jury may infer the existence of retaliation." *See Reeves,* 530 U.S. at 148.

Defendant contends that Blair's comments to Cisco Systems were legitimate and nondiscriminatory as they were based upon the alleged performance deficiencies of Plaintiff. In support of its argument, Defendant cites the cases of *Fields v. Phillips Sch. of Tech.,* 840 F.Supp. 149

---

[4] June 6, 2000, was the date that Keeley was removed from consideration for the position of Major Accounts Manager.

(W.D.Tex. 1994) and *McBroom v. City of Amarillo*, 2001 U.S.Dist. LEXIS 13855 (N.D.Tex. 2001). These cases, however, are easily distinguishable from the present situation.

In *Fields*, plaintiff's supervisor completed a form evaluating the plaintiff's job performance. The Defendant indicated, through checking appropriate boxes, that plaintiff was below average in several work categories. The Defendant also noted on the form that the plaintiff had been terminated due to tardiness and insubordination. The Court granted summary judgment for Defendant based upon the legitimate references to Plaintiff's job performance. *See Fields v. Phillips Sch. of Tech.*, 840 F.Supp. 149 (W.D.Tex. 1994).

In *McBroom*, the Plaintiff's past supervisor, in response to repeated requests by Plaintiff's boyfriend, posing as a potential employer, mentioned both the positive and negative aspects of Plaintiff. The Court, in granting summary judgment, determined that the comments made were even handed and any negative information was related to behavior to which Plaintiff had admitted. *Id.* at *11. Further, the Court held that Defendant's statements were truthful and related to Plaintiff's job performance.

In the case at bar, the comments by Blair in no way referenced Keeley's job performance, they were not tempered by positive comments, they did not relate to behavior which Keeley had admitted, nor were the Defendant's allegations of Keeley's alleged performance deficiencies outlined in Sun's business records. Defendant's semantics regarding the "fish in the sea" comment do not obscure the operative facts of this case, that Blair, in retaliation for Keeley's protected activity, told Cisco Systems that it should not hire Keeley.

Moreover, Defendant's attempt to portray Keeley as a marginal salesman is not supported by the evidence. Specifically, the alleged performance deficiencies of which Defendant complains were

never documented and were never placed in Plaintiff's personnel file. *See Appendix* pp. 1, 80-81. In addition, in the midst of these alleged performance deficiencies, Keeley was awarded retention stock by Sun Microsystems. *See Appendix* pp. 1, 97. This stock is awarded by the company to employees that it wishes to retain and for excellent achievement in the sales department. *See Appendix* pp. 1, 97. Defendant's supplied explanation is therefore contradictory and false. Either Keeley was a problem employee with numerous performance deficiencies or he was a valued member of the sales staff which Sun wanted to keep. Sun's conduct toward Keeley establishes the latter. *See Appendix* pp. 1-2, 97, 178.

Finally, if Blair's comments were indeed neutral and nondiscriminatory as alleged by Sun, why wasn't Sun forthcoming about Blair's comments in its Responses to Plaintiff's First Set of Interrogatories? Specifically, in response to Plaintiff's First Set of Interrogatories, Sun indicated that Blair had responded to an inquiry from Cisco Systems regarding Keeley and that he had informed Cisco Systems that pursuant to Sun Microsystem's policy, "he could not disclose any information other than to verify that Keeley was a previous employee." *See Appendix* pp. 341-342. However, after Cisco Systems supplied its Responses and revealed that Blair had told it to "take a pass on Keeley," Sun amended its Responses and admitted to the statements attributed to Blair by Cisco. *See Appendix* pp. 363, 403-404. These facts not only call into question the credibility of Defendant, but the credibility of Kevin Blair in particular. Accordingly, a fact issue exists and summary judgment should be denied.

    *4.    But for Keeley's protected activity, he would have been hired by Cisco*

As shown above, there is a material fact issue as to whether Blair was aware of Keeley's protected activity at the time he told Cisco to "take a pass on Keeley." Defendant, however, argues that

summary judgment should still be granted because Keeley cannot establish "but for" the actions of Blair, he would have been hired by Cisco. This argument is simply not supported by the facts.

Keeley was the seventeenth individual interviewed for the Major Account Manager position. *See Appendix* p. 16. He was also the first applicant who possessed the necessary skill set and who would be a good fit for the company. *See Appendix* pp. 12, 49-50. [5] After successfully interviewing for the position, Keeley was sent an offer letter on May 30, 2000, and, according to the testimony of Dean Ash, Cisco Systems would have hired Mr. Keeley for the Major Account Manager position if he had not received communication from Kevin Blair stating words to the effect that Ash should not hire Keeley. *See Appendix* p. 33. Nevertheless, Defendant argues that Ash based his decision not to hire Plaintiff in large part to the alleged communication issue between Keeley and Karen Ward.

However, the email Dean Ash sent to Michele Keetch evidences that the impetus for removing Keeley from consideration for the Major Account Manager position was the "disturbing information he [Ash] received from a confidential source regarding Keeley's exit" from Sun. [emphasis added] *See Appendix* p. 72. Karen Ward's additional observations, while relayed to Dean Ash prior to June 6, 2000, were not listed as a basis for removal anywhere in the email sent by Ash to Michele Keetch. *See Appendix* pp. 30, 72. Finally, it is undisputed that Ms. Ward informed Ash that she could work with Keeley and that she never informed Ash that she could not work with Keeley. *See Appendix* p. 55.

Notwithstanding the evidence that Cisco would have hired Keeley, Defendant, in an attempt to bolster its argument cites the case of *Willis v. Sweetheart Cup.,* 2002 U.S.Dist. LEXIS 498 (N.D.Tex.

---

[5] This fact further belies Defendant's argument that Keeley was a salesman of "marginal skill."

2002)(Boyle, M.). *Willis*, however, is easily distinguishable from the present case. In *Willis*, the

Plaintiff could not establish that he had ever been offered a permanent position and the Defendant merely

informed the potential employer that Plaintiff could not make deliveries to the Sweetheart premises. In

the case at bar, Keeley has provided summary judgment evidence that he was offered permanent

employment by Cisco. Furthermore, Keeley has provided summary judgment evidence that Blair told

Cisco Systems that it should "take a pass on Keeley." As the facts in the present case are quite different

from those presented in *Willis, Willis* is not dispositive and summary judgment should be denied.

     5.      *Finally, the Cause Determination issued by the EEOC, as well as the credibility*
               *issues of Blair, raise a material fact issue*

This circuit has held that the findings and conclusions of the EEOC can serve to establish a

*prima facie* case of discrimination. *See Turpen v. Missouri-Kan.-Tex.R.R. Co.,* 736 F.2d 1022, 1026

(5th Cir. 1984)(citing *Smith v. Universal Servs.,* 454 F.2d 154 (5th Cir. 1972). Notwithstanding legal

precedent, Plaintiff does not contend that the cause determination, by itself, creates a fact issue as to

whether Keeley has established a *prima facie* case of discrimination; rather Plaintiff contends that the

EEOC Cause Determination, along with the evidence presented by Plaintiff is sufficient to raise a

material fact issue. *See Khanna v. Park Place Motorcars of Houston, Ltd.,* 2000 WL 1801850

(N.D. Tex.)(Fitzwater, J.)(Plaintiff need only raise a genuine issue of material fact at the summary

judgment stage). For all of the reasons listed above, Defendant's Motion for summary judgment should

be denied.

**C.    Defendant Sun Microsystems tortiously interfered with Plaintiff's prospective employment with Cisco Systems.**

       *1.    Defendant has applied the wrong legal standard*

Defendant, citing the case of *Wal-Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711 (Tex. 2001), contends that Plaintiff cannot maintain his tortious interference with prospective employment claim because he cannot establish that Blair committed an independently tortious or unlawful act.  The legal standard defined in *Wal-Mart*, however, is not applicable to Keeley's claim for tortious interference with prospective employment.

In *Wal-Mart*, the Plaintiffs contracted for the purchase of commercial property.  The contract gave purchasers the right to terminate the lease if within sixty days they were unable to lease the property and secure the written approval of Wal-Mart to the intended use of the property.  The Plaintiffs intended to lease the property to Fleming Foods, who planned to build a food store in the area.  Wal-Mart initially indicated that it would approve the intended use for the property.  *Id.* at 714.

Upon reconsideration, Wal-Mart informed Fleming Foods that it desired to expand onto the property at issue and that if it could not acquire the commercial property, it would close its store and relocate.  Since Fleming was not interested in leasing the property without a Wal-Mart next door, it informed Plaintiffs that it was not interested in leasing the property.  *Id.*  The Plaintiffs then opted out of their contract and several months later, Wal-Mart purchased the commercial property and expanded its store.  *Id.*  Thereafter, the Plaintiffs sued Wal-Mart for tortiously interfering with their prospective lease with Fleming.

After the trial court, the jury returned a verdict in favor of the Plaintiffs.  The Court of Appeals affirmed the verdict.  In reversing the jury verdict, the Texas Supreme Court delineated a new standard

for tortious interference with prospective business contracts. The Texas Supreme Court stated that to

maintain a cause of action for tortious interference with prospective business relations, a Plaintiff must

prove that the defendant's conduct was independently tortious or wrongful. *Id.* at 726. However, in

delineating this new legal standard, the Texas Supreme Court was very clear in stating that this standard

applied to situations of business competition. Specifically, the Court stated:

> "In reaching this conclusion, we treat tortious interference with
> prospective business relations differently than tortious interference
> with contract. It makes sense to require a defendant who induces
> a breach of contract to show some justification or privilege for
> depriving another of benefits to which the agreement entitled him.
> ***But when two parties are competing for interests to which***
> ***neither is entitled, then neither can be said to be more***
> ***justified or privileged in his pursuit.*** If the conduct of each
> is lawful, neither should be heard to complain that mere
> unfairness is actionable. Justification and privilege are not
> useful concepts in assessing interference with prospective
> relations, as they are in assessing interference with an
> existing contract. *Id.* at 727. [emphasis added].

Notwithstanding this clear directive from the Court, Defendant attempts to further its argument

regarding the application of the *Sturges* standard by citing two cases, *Willis v. Sweetheart Cup,* 2002

U.S.Dist. LEXIS 498 (N.D.Tex. 2002)(Boyle, M.) and *Baty v. Protech Ins. Agency,* 63 S.W.2d 841

(Tex.App.–Houston [14th Dist.] 2002, no pet.). These cases, however, do not support the application

of the *Sturges* standard to the present situation. In *Willis*, the Plaintiff complained of the loss of an

employment opportunity. While addressing the *Sturges* standard, Magistrate Boyle stated that *Sturges*

"fell short" of stating the elements of the particular tort in front of her:  interference with potential

employment. *Id* at *4.

A review of *Baty* reveals that it, like *Sturges*, deals with a situation where two parties are involved in a business competition situation. In *Baty*, an independent insurance agency brought an action against two of its former officers, their new company and four other insurance companies. The Plaintiff alleged that the Defendants and their new insurance companies had breached their fiduciary duties and had wrongfully diverted business from Plaintiff. In a free enterprise system, it is certainly justifiable to encourage business competition. However, there is no similar public policy justification for allowing interference with prospective employment opportunities. Such is the situation presently before this Court.

Three cases decided after *Sturges* are instructive on the application of the correct legal standard for tortious interference in a prospective employment situation. *See Borner v. Zale Lipshy University Hospital,* 2002 WL 449576 (N.D.Tex. 2002)(Buchmeyer, J.); *See also Larson v. Family Violence and Sexual Assault Prevention Center of South Texas*, 64 S.W.3d 506 (Tex.App.– Corpus Christi, 2001, pet. denied); *See also Taylor v. Beacon Industries, Inc.,* 2001 WL 1029477 (N.D.Tex. 2001)(Kaplan, M.).

In *Borner*, the Plaintiff filed a claim for, among other causes of action, tortious interference with prospective business relations. Plaintiff's claimed that she had been prevented from obtaining employment because of an erroneous background report. In a March 2002, decision,[6] Judge Buchmeyer decided the claim using the following legal standard: 1) a reasonable probability that plaintiff would have entered into a contractual relationship; 2) defendant's intentional and malicious conduct; 3)

---

[6] This case was decided after *Willis v. Sweetheart Cup*, 2002 U.S.Dist.LEXIS 498 (N.D.Tex. 2002)(Boyle, M.).

causing actual harm by preventing the business relationship; and 4) a lack of legal justification or excuse for defendant's actions. *Id.* at *10 (citing *Kiepfer v. Beller*, 944 F.2d 1213, 1220 (5th Cir. 1991)).

In *Larson*, the Plaintiff brought suit against Defendant for tortious interference with prospective contract as a result of media reports regarding the Shelter and because alleged facsimiles with disparaging comments about her were received by prospective employers. In analyzing Plaintiff's tortious interference with a prospective contract claim, the Court applied the legal standard outlined above. *See Larson,* 64 S.W.3d at 517. Finally, in *Taylor v. Beacon Industries*, 2001 WL 1029477 (N.D.Tex. 2001), Plaintiff brought suit against Defendant for tortious interference with prospective contract alleging that Defendant had told his prospective employer that he "was not a good employee and would not be rehired by Beacon in the future because he did not do his job and had very high unexcused absences." Magistrate Kaplan, in deciding the tortious interference with prospective contract claim, applied the same legal standard as outlined in *Borner*.

These cases, all decided after *Sturges* and all dealing with situations in which an individual alleged deprivation of an employment opportunity, all applied the legal standard outlined by Judge Buchmeyer in *Borner*. Accordingly, the correct legal standard to be applied in the present case is that applied in *Borner, Larson* and *Taylor*.

> 2.   *Applying the correct legal standard, there is, at a minimum, a material fact issue as to whether Defendant tortiously interfered with Plaintiff's prospective employment.*

Texas law protects prospective as well as existing contracts from third party interference. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex. 1989). The elements of a tortious interference with prospective contract or business relationships are:  (1) a reasonable probability that the

parties would have entered into a contractual relationship, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff, and (3) actual harm or damage resulted from the defendant's interference. *Id.*; *See also Exxon Corp. v. Allsup,* 808 S.W.2d 648 (Tex.App.--Corpus Christi 1991, writ denied). In the present case, there is, at a minimum, a material fact issue as to whether Defendant Sun Microsystems tortiously interfered with Plaintiff's prospective employment.

### Keeley and Cisco Systems would have entered into a contractual relationship

To prove a cause of action for tortious interference, one must show a reasonable probability that the parties would have entered into a contractual relationship. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex. 1989). Defendant alleges that Plaintiff was not hired for the position of Major Account Manager due to, in large part, his communication issues with Karen Ward. However, according to the testimony of Dean Ash, Cisco Systems would have hired Mr. Keeley for the Major Account Manager position if he had not received communication from Kevin Blair stating words to the effect that Ash should not hire Keeley. [7] *See Appendix* p. 33.

Furthermore, the email Dean Ash sent to Michele Keetch evidences that the impetus for removing Keeley from consideration for the Major Account Manager position was the disturbing information he received from a confidential source regarding Keeley's exit from Sun. Karen Ward's additional observations, while relayed to Dean Ash prior to June 6, 2000, were not listed as a basis for

---

[7] Prior to deciding to hire Mr. Keeley, Mr. Ash had interviewed sixteen (16) potential applicants for the position of Major Account Manager before interviewing Plaintiff; with all of the applicants lacking qualifications for the position. *See Appendix* pp. 14-16. It is undisputed that Defendant Cisco Systems considered Plaintiff to be qualified and offered him the position of Major Account Manager. *See Appendix* pp. 14-16.

removal anywhere in the email sent by Ash to Michele Keetch. *See Appendix* pp. 30, 72. Finally, it is undisputed that Ms. Ward informed Ash that she could work with Keeley and that she never informed Ash that she could not work with Keeley, contrary to the assertion made by Defendant. *See Appendix* p. 55. As such, there is at a minimum, a material fact issue as to the reasonable probability of a contractual relationship and summary judgment should be not granted.

### Kevin Blair intentionally interfered with Keeley's employment with Cisco Systems

Defendant Sun admitted to the comments made by Kevin Blair only after Cisco Systems, in response to discovery, revealed the substance of those comments. Specifically, Cisco revealed that Blair told it to "take a pass on Keeley." In addition, in his deposition, Kevin Blair admitted that after being informed by Mr. Ash that he was considering Plaintiff for the position, he told Dean Ash words to the effect that Cisco should "take a pass on Keeley." *See Appendix* pp.151, 363. [8] Such action on the part of Kevin Blair was done intentionally and with the purpose of harming Plaintiff. *See Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993).

Moreover, this action was done in direct violation of Sun Microsystems reference policy. *See Appendix* pp. 84-85, 102, 154-156. Specifically, according to Sun Microsystem's reference policy, the only information to be provided about an employee was the period of employment with the company. *See Appendix* pp. 154-156. By telling Defendant Cisco Systems to look at other applicants, Blair not only violated company policy, he also tortiously interfered with Keeley's prospective employment. If Blair had simply adhered to Sun Microsystem's reference policy, it is

---

[8] Defendant Cisco has continually maintained that it received information that it should, in effect, take a pass on Keeley. *See Appendix* pp. 151, 363.

**Plaintiff's Brief in Support of Response**
**to Defendant's Motion for Summary Judgment - Page 30**

reasonably probable that Keeley would have began employment with Cisco Systems. *See Appendix* p. 33.

Defendant, however, contends that it is not liable for tortious interference because Blair's comments do not constitute activity for which civil liability may be imposed. Specifically, Defendant contends that Blair's comments are protected by Texas Labor Code Section 103.003-004. Pursuant to Texas Labor Code Sections 103.003 and 103.004, "an employer who discloses information about a current or former employee's *job performance*[9] . . .is immune from civil liability for that disclosure..." [emphasis added]. Blair's comments, however, are not protected by the Texas Labor Code. Specifically, the Texas Labor Code defines "job performance" as the "manner in which an employee performs a position of employment and includes an analysis of the employee's attendance at work, effort, knowledge, behaviors, and skills." *Tex.Lab.Code Ann.* § 103.002 (Vernon 2002).

Blair told Cisco Systems that it should take a pass on Keeley. *See Appendix* pp. 151, 363. This comment in no way referenced the manner in which Keeley performed his position, nor was this comment an analysis of Keeley's "attendance at work, effort, knowledge, behaviors, and skills." *See Tex.Lab.Code Ann.* § 103.002 (Vernon 2002). As such, Blair's comments are not protected by the Texas Labor Code and there is, at minimum, a material fact issue as to whether Blair intentionally interfered with Keeley's employment.

### Plaintiff suffered actual harm because of the interference

In the present case, because of Defendant Sun Microsystem's interference with his prospective employment, Keeley lost the position of Major Account Manager as well as the salary and benefits that

---

[9]  Defendant's citation curiously omits the reference to job performance.

accompanied that position.  *See Appendix* pp. 29, 72 .  Defendants' own expert concedes that as a result of losing the Major Account Manager position, Keeley, for the period of June 2000 to June 2002, suffered damages in the amount of $340, 713.00.  *See Appendix* p.  311.  Accordingly, summary judgment should be denied.

> 3.   *Assuming arguendo that the Sturges standard does apply, Plaintiff can allege an independently tortious or unlawful act*

Assuming that the *Sturges* standard does apply to the present case, summary judgment should not be granted because Defendant committed an unlawful act.  Specifically, the actions of Defendant constitute retaliation.  As outlined by the *Sturges* court, Plaintiff does not have to prove retaliation, rather Plaintiff must only prove that the Defendant's conduct would be actionable.  *Sturges*, 53 S.W.3d at 726.  In the present case, as outlined above, there is a material fact issue as to whether Defendant's conduct constitutes retaliation, an unlawful act.  Accordingly, summary judgment should not be granted.

**D.     Plaintiff has not released his tortious interference claim**

Defendant argues that summary judgment should be granted because Keeley released his tort claim against Sun.  On this issue, summary judgment should be denied because: (1) the provision does not mention a tortious interference claim,[10] (2) the provision only applies information provided to Cisco and the outside agency and, (3) the provision is contrary to public policy.

---

[10] Furthermore, this provision fails because there is insufficient consideration.  *See Gulf Liquid Fertilizer Co. v. Titus,* 354 S.W.2d 378, 385 (Tex. 1962)(consideration must be sufficient).  In the present case, in exchange for signing the application, Keeley was not given any consideration.  Being considered for the position is not consideration as Keeley was already being considered prior to signing the application.  Moreover, the provision fails because there is a lack of mutuality of obligation.  *See Hutchings v. Slemons,* 174 S.W.2d 487, 489 (Tex. 1943)(Mutuality of obligation is determined at the time enforcement is sought, not at the time the promises were made).  Enforcement of the obligation is being sought by the Defendant now.  However, the Defendant can point to no consideration it has given to the Plaintiff in exchange for the promise.

*1.     The provision does not specify which claims are to be waived*

The employment application signed by Keeley mandates that all claims ensuing from any background information obtained regarding Keeley will be waived. *See Appendix* p. 64. However, to effectively release a claim in Texas, the releasing instrument must "mention" the claim to be released. *See Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 938 (Tex. 1991). Any claims not "clearly within the subject matter" of the release are not discharged. *Id.* Furthermore, general categorical release clauses are narrowly construed. *See Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 422 (Tex. 1984).

Here, the employment application which purports to release the Defendants from "any and all causes of action ..." does not mention the claim of tortious interference with prospective employment. *See Appendix* p. 64. Absent such reference, the employment application does not release the Defendants from a claim for tortious interference with prospective employment. *See Trinity Industries, Inc. v. Ashland, Inc. and ATEC, Inc.,* 53 S.W.3d 852 (Tex.App.–Austin 2001, pet. denied).

In support of its argument that Keeley has released its tort claims, Defendant cites the case of *Lawrence v. CDB Services, Inc.,* 44 S.W.3d 544 (Tex. 2001). *Lawrence,* however, is easily distinguishable. In *Lawrence,* the Texas Supreme Court determined that the Workers' Compensation Act did not prohibit employees from electing to participate in a nonsubscribing employers' benefit plan in lieu of exercising common law remedies. In pertinent part, the benefit plan contained the following language:

> "I understand that by electing to participate in the Plan,
> I will lose any right that I may have had to sue Employer...
> resulting from their negligence or any other conduct actionable

under the common law of the State of Texas, the statutes of the
State of Texas, or under any otherwise available equitable relief."
*Id.* at 546.

In the instant case, the provision complained, unlike *Lawrence*, does not mention any claims to be released. Moreover, the Court in *Lawrence* determined that the parties intended to release defendant from liability for its own future negligence. In the present case, Keeley did not intend to release Sun, a non-party to the agreement, from liability for intentional tortious conduct. *See Appendix* p. 3. Accordingly, the provision does not waive the claim of tortious interference with prospective employment and summary judgment should be denied.

   2.   *The release only applies to information supplied to Cisco and the outside agency*

A review of the release in question clearly indicates that the waiver applies only to information which was provided to Cisco and the outside agency. *See Appendix* p. 64.[11] Specifically, the waiver contains the following exculpatory language:

> "I unconditionally release and hold harmless any individual, corporation,
> or private or public entity from any and all causes of action that might
> arise from furnishing to Cisco Systems Inc., and the outside agency
> information that they may request pursuant to this release."
> *See Appendix* p. 64.

This particular provision was written by Defendant Cisco Systems and, as such, it must be strictly construed in favor of the Plaintiff to reach a result reasonably consistent with the apparent intent of the parties. *See Republic National Bank of Dallas v. Northwest National Bank of Fort Worth,* 578 S.W.2d 109 (Tex. 1978). It is clear from the plain language of the release that it only applies to the information supplied to both Cisco and the outside agency. The information complained of in the

---

[11] The outside agency which conducted the background investigation was HireRight.com. *See Appendix* pp. 65-67.

present case, namely the negative reference supplied by Kevin Blair to Dean Ash, was not supplied to

HireRight.com. As such, Keeley's claims have not been waived.

Moreover, the language of the release, as well as the essence of the release, specifically applies

to background investigations to be conducted by an outside agency as well as the report produced by

the agency. *See Appendix* p. 64. HireRight.com checked Keeley's references and reported to

satisfactory responses to Cisco. *See Appendix* p. 65. Furthermore, Blair was not a reference

supplied by Keeley. *See Appendix* p. 63. Accordingly, Keeley has not released his tort claim and

summary judgment should be denied.

> 3.      *The release provision is contrary to public policy*

Parties may contract to release future liability unless the agreement is unconstitutional, violates

law, or is against public policy. *See Allright, Inc. v. Elledge,* 515 S.W.2d 266, 267 (Tex. 1974). To

determine "whether an agreement is against public policy, courts look to the relationship between the

parties." *Id.* If a disparity in bargaining power exists in the relationship, the agreement will not be

enforced. *Id.* A disparity in bargaining power exists when the releasing party "has no real choice" or is

"practically compelled" to accept the agreement. *Id.*; *See also Crowell v. Housing Auth.,* 495 S.W.2d

887, 889 (Tex. 1973).

In the present case, to be considered for employment with Defendant Cisco Systems, Plaintiff

had to agree to a background check and indicate his assent by signing the application under the

authorization for the background check. *See Appendix* p. 64. If Keeley had refused to give his consent

to have the background investigation conducted, Keeley would have been eliminated from consideration

for the position. Keeley was essentially forced to agree to an exculpatory provision which would waive any cause of action. Such a provision should be held invalid as contrary to public policy. *See Allright,* 515 S.W.2d at 267-68; *Crowell,* 495 S.W.2d at 899; *See Also Solis v. Evins,* 951 S.W.2d 44 (Tex.App.–Corpus Christi 1997, no pet.)(stating that a provision which would allow a party to contractually exculpate itself with respect to intentional torts is contrary to public policy).

When Keeley signed the agreement, he was consenting to the background investigation, he did not consent to waiving his rights to any and all future causes of action that might arise. If such a provision, which does not specifically mention any cause of action, is held valid, then a potential employee would not be able to sue even if false, malicious, defamatory information was provided to a prospective employer. Accordingly, summary judgment should be denied.

**E.    There is a material fact issue as to Plaintiff's breach of contract claim**

In the present case, Keeley's breach of contract claim is simply a claim for commissions earned by Keeley under the FY '99 Sales Compensation Plan but not paid by Defendant. *See Appendix* p. 181-308, 335-336. The Plan provided that salesmen were to be paid a commission for equipment sold to end-user clients who were listed on the salesmen's goal sheets. *See Appendix* p. 335-336.[12] In FY '99, Verio, which was an ISP for which dual credit was available, was listed on Keeley's goal sheet. Verio purchased ver two million dollars ($2,000,000.00) of equipment from Sun Microsystems for end-user purposes in FY '99. Keeley was thus entitled to commissions on the two million dollars ($2,000,000.00) worth of equipment bought by Verio. *See Appendix* pp. 174-176.

---

[12] This is exhibit is a goal sheet similar to the one Keeley had in FY '99. It is undisputed that Verio was on Keeley FY '99 goal sheet. *See Appendix* p. 76

Moreover, Keeley was repeatedly informed that he would be paid 100% compensation for the end-user products purchased by Verio. *See Appendix* pp. 174-176. It is undisputed that Keeley was not paid the full amount of commissions due on a two million dollar ($2,000,000.00) sale. *See Appendix* pp. 178-180. Specifically, Keeley was entitled to over sixty thousand dollars ($60,000.00) in commissions. *See Appendix* pp. 2. Sun has failed to pay Keeley the commissions earned in the FY '99.[13] Because Keeley is owed commissions by Defendant, summary judgment should be denied.

**F.     The After-Acquired Evidence Doctrine does not apply**

Finally, Defendant argues in the alternative that Keeley's damages should be limited under the after-acquired evidence doctrine. However, Defendant's argument fails as a matter of law. Under the after-acquired evidence doctrine, relief to an aggrieved employee may be cut off at the time that a legitimate discharge would have occurred. *See McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352 (1995). The pertinent inquiry is whether the employee would have been fired upon discovery of the wrongdoing, not whether he would have been hired in the first instance. *See Shattuck v. Kinetic Concepts, Inc.,* 49 F.3d 1106 (5th Cir. 1995). The rationale underlying consideration of after-acquired evidence is that the employer should not be impeded in the exercise of legitimate prerogatives and the employee should not be placed in a better position than he would have occurred absent the discrimination. *See McKinnon,* 513 U.S. 360-362.

---

[13] Contrary to Defendant's argument, Plaintiff is not requesting payment for products bought after his employment ended with Sun. Keeley is simply requesting that he be paid commissions which had already accrued prior to his separation from Sun. *See Appendix* pp. 174-176.

Plaintiff's Brief in Support of Response
to Defendant's Motion for Summary Judgment - Page 37

In the case at bar, Defendant argues that the after-acquired evidence doctrine should be used to limit Keeley's claim for any damages occurring after May 24, 2002.[14] Keeley, however, is complaining of employment that he lost with Cisco Systems, not Sun Microsystems. Defendant Sun would not have had any authority to fire Keeley once he was working for Cisco Systems. The rationale underlying the doctrine would not be served because Sun would not have been in a position to exercise any prerogatives regarding Keeley. As such, Sun's argument for the application of the doctrine is not credible. Furthermore, an application of the doctrine to Keeley's breach of contract is not warranted because Keeley's claim for lost commissions accrued long before March 24, 2002. *See Appendix* pp. 174-176. Accordingly, under the facts of this case, any application of the after-acquired evidence doctrine is not warranted and Defendant's motion for partial summary judgment should be denied.[15]

## G.    Conclusion

Based upon the foregoing arguments and authorities, Defendant Sun Microsystems is not entitled to Summary Judgment with respect to any of Plaintiff's claims. Therefore, Plaintiff respectfully requests that Defendant's Motion, in all things, be denied and that Plaintiff be granted such other and further relief to which he may be justly entitled.

---

[14] This is the date that Defendant learned that Plaintiff was allegedly working Exodus Communications and Sun Microsystems from January 4, 2000, until January 20, 2000.

[15] Assuming arguendo that the doctrine did apply, Defendant has not presented any evidence from Cisco Systems that it would have fired Keeley for any wrongdoing.

Respectfully submitted

**WHITE & WIGGINS, L.L.P**

**H. RON WHITE**
Bar Card No. 21303500
**KEVIN B. WIGGINS**
Bar Card No. 21441600
**TRACEY R. WALLACE**
Bar Card No. 00797617
1999 Bryan Street
Suite 3470
Dallas, Texas  75201
(214) 665-4150
(214) 665-4170 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been forwarded in accordance with the Federal Rules of Civil Procedure on this the 3rd day of April, 2003.

**TRACEY R. WALLACE**